# IN THE SUPREME COURT OF IOWA

No. 12–0255

Filed August 23, 2013

**STATE OF IOWA,**

Appellee,

vs.

**CHRISTOPHER CRAIG THOMPSON,**

Appellant.

_____

Appeal from the Iowa District Court for Allamakee County, John J. Bauercamper, Judge.

Defendant appeals his conviction after a jury found him guilty of second-degree murder. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers and Andrew B. Prosser, Assistant Attorneys General, and Jill M. Kistler, County Attorney, for appellee.

**WATERMAN, Justice.**

An Allamakee County jury found defendant, Christopher Craig Thompson, guilty of second-degree murder for the death of his live-in girlfriend, Angela Gabel. He fatally shot her twice in the head after she made an obscene gesture from inside a parked car where she had retreated during an argument. He appeals on four grounds, arguing the district court erred by (1) failing to submit an instruction on the lesser included offense of voluntary manslaughter; (2) excluding hearsay evidence relevant to his diminished-capacity defense based on his posttraumatic stress disorder (PTSD); (3) declining to obtain and review the deceased victim's mental health records for exculpatory information under *State v. Cashen*, 789 N.W.2d 400 (Iowa 2010), and Iowa Code section 622.10(4) (Supp. 2011); and (4) applying the wrong standard in rejecting his claim the verdict was contrary to the evidence.

We retained the appeal to decide the constitutionality of section 622.10(4). For the reasons explained below, we uphold the statute as constitutional on its face. We conclude the district court committed no reversible error in any of the rulings challenged on appeal. We therefore affirm Thompson's conviction.

## I. Background Facts and Proceedings.

"We recite the facts in the light most favorable to the verdict." *State v. Garcia*, 616 N.W.2d 594, 595 (Iowa 2000). By all accounts, Thompson and Gabel had a rocky relationship. They had been living together at a farmhouse outside Monona, Iowa, for about two years. In October 2010, the other residents of the farmhouse were their eight-month-old son and Gabel's teenage daughters from a prior marriage, Sierra and Savana. Thompson worked on the road during the week and returned home on weekends.

On the weekends, Thompson would drink heavily—typically consuming a case of beer. Thompson and Gabel regularly argued. During their arguments, they would sometimes slap each other. Gabel often slept in her daughters' bedroom to get away from Thompson. Thompson's relatives viewed Gabel as the verbal aggressor. A friend urged Thompson to break up with her.

On Saturday, October 2, Thompson was home most of the day watching football and taking care of their son, while Gabel was at work. Thompson began drinking at around 3 p.m. Sierra and her boyfriend returned home about 6 p.m. to get ready for her high school's homecoming dance. Gabel arrived home between 7 and 8 p.m. Sierra noted Thompson was being "grouchy" towards her mother. Shortly after 8 p.m., Sierra and her boyfriend left for the dance. At around 11:30 p.m., Gabel called Sierra, who was still at the dance. Sierra went home after receiving the call because her mother sounded scared, "like something was wrong." She found police cars blocking the entrance. The officers would not let Sierra in and later told her that her mother was dead.

Law enforcement from the Allamakee County Sheriff's Office and the Monona Police Department responded to a 911 call Thompson placed at 11:32 p.m. Thompson told the dispatcher he and his girlfriend got in a fight and while she was sitting in a car, "[s]he gave me the big F finger and I f_____ shot her." When the officers arrived they found Gabel dead inside a red Corsica parked in the farmhouse driveway. Thompson came out of the house with his son in his arms. Officers advised him to put his hands up, but Thompson retreated back into his house. Thompson ultimately surrendered to the police at 1:19 a.m. and was taken to the Waukon Police Department.

Thompson was read his *Miranda* rights at approximately 2 a.m. He agreed to a videotaped interview. During that interview, Thompson estimated that he drank eighteen beers, but said he did not know whether he was sober. Deputy Clark Mellick testified Thompson was intoxicated but "was actually functioning at that time." Thompson was later given a breath test after the interview ended at 4:40 a.m. His blood alcohol level was .184.

Thompson vented to the officers about the problems in his relationship with Gabel. They fought over money. He said he paid the bills while she gambled at the riverboats. Thompson complained about their infrequent sex life. He complained that she failed to properly discipline the children. Thompson said they fought often and that Gabel would slap him or punch him all the time. Gabel had also put a pistol to his head and pulled the trigger. Thompson said he had been telling Gabel for the past four months that she should leave because they didn't get along and because his "head was snappin'." As he put it, "Sometimes a guy just can't f_____ take it anymore."

Thompson told officers that they began arguing on the day of the incident sometime after the game they were watching ended. Thompson claimed Gabel was upset with him because he wanted to watch more football while she wanted to go have sex with him. Gabel decided to go to bed without him at around 10:30 p.m. When Thompson came up later, she was asleep. He woke her up to have sex. Gabel told him it was too late. Thompson told the officers that her temper flared after he called her a "bitch" and told her he pays for everything for her even though she does nothing for him. Gabel got out of bed and slapped him. Thompson then pushed her against the wall. Gabel left the room and ran downstairs and outside while they continued to yell at each other.

Thompson accused her of leaving to go to the riverboat casino. Once outside, Gabel climbed into her daughter's car after finding hers locked. Thompson, watching from the deck, saw Gabel flip him off and saw her talking on her cell phone. Thompson believed Gabel was talking to his mother, telling her what a "bad guy" he is. He was "pissed off" and went inside to retrieve a .22 caliber rifle from their bedroom.

He came back out onto the deck with the rifle. Gabel flipped him off again. Without aiming, Thompson fired the gun at her from fifteen to twenty feet away. The bullet went through the driver's side window. He told police he only meant to scare her with the first shot, not kill her. He approached to find her breathing, but could tell "she wasn't gonna make it." Thompson told officers he shot her a second time to "put her out of her misery." He was three feet away when he fired the second shot. The autopsy showed Gabel was shot twice in the head and either shot could have been fatal.

On October 7, the State filed a trial information charging Thompson with murder in the first degree, in violation of Iowa Code sections 707.1, 707.2(1), and 707.2(2) (2009). He pled not guilty and waived his right to speedy trial. He filed a notice of intent to rely on the defenses of insanity and diminished responsibility. He filed a motion to suppress his statements to police, claiming he lacked the mental capacity to waive his *Miranda* rights. The district court held a hearing on the motion and denied it. Thompson does not appeal the ruling allowing his videotaped confession into evidence.

On August 15, 2011, Thompson filed an application for discovery asking the district court to conduct an in camera review of Gabel's mental health records to determine if they contained exculpatory

evidence. The district court held a hearing on September 12 and denied the application in a written ruling two days later.

The jury trial began November 8. The jury found Thompson guilty of the lesser included offense of murder in the second degree, in violation of Iowa Code section 707.3. The district court denied Thompson's combined motion for new trial and arrest of judgment. The court sentenced Thompson to a term of incarceration not to exceed fifty years. Thompson appealed.

We discuss additional facts and procedural history with the specific issues decided below.

## II. Scope of Review.

A district court's refusal to submit a requested jury instruction is reviewed for correction of errors at law. *State v. Rains*, 574 N.W.2d 904, 915 (Iowa 1998). We review the district court's evidentiary rulings for abuse of discretion. *State v. Huston*, 825 N.W.2d 531, 536 (Iowa 2013). Rulings on the admissibility of hearsay evidence are reviewed for correction of errors at law. *State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003). Discovery rulings challenged on constitutional grounds are reviewed de novo. *Cashen*, 789 N.W.2d at 405 ("Because the issues in this case rest on constitutional claims involving Cashen's due process right to present a defense, our review is de novo."). Nonconstitutional challenges to discovery rulings are reviewed for abuse of discretion. *Id.* ("Ordinarily, we review discovery orders for an abuse of discretion."). We review claims of ineffective assistance of counsel de novo. *In re Det. of Blaise*, 830 N.W.2d 310, 315 (Iowa 2013). We review a district court's ruling as to whether a verdict was contrary to the weight of the evidence for abuse of discretion. *State v. Reeves*, 670 N.W.2d 199, 202–03 (Iowa 2003).

### III. Analysis.

**A. Voluntary Manslaughter Jury Instruction.** Thompson contends the district court erred by failing to submit his requested jury instruction on the lesser included offense of voluntary manslaughter. The district court concluded the evidence of provocation was insufficient to support submission:

> The court is concerned that the factual record is inadequate to give Voluntary Manslaughter under Uniform Instruction 700.15, specifically finding evidence in the record of provocation as defined by Uniform Instruction 700.16. The court understands that there is evidence of the victim having slapped the Defendant. There is evidence of the victim having given the Defendant the finger on several occasions. The court is not satisfied that that constitutes provocation.

We agree. Thompson had to show "serious provocation" by Gabel. *See* Iowa Code § 707.4. The evidence of serious provocation in this case— that Gabel slapped Thompson and flipped him off before he shot her— was insufficient to submit a voluntary manslaughter instruction.

"Lesser offenses must be submitted to the jury as included within the charged offense if but only if they meet both the appropriate legal and factual tests." *State v. Ware*, 338 N.W.2d 707, 714 (Iowa 1983). An offense meets the legal test if " '[t]he lesser offense [is] composed solely of some but not all elements of the greater crime.' " *State v. Sangster*, 299 N.W.2d 661, 663 (Iowa 1980) (quoting *State v. Furnald*, 263 N.W.2d 751, 752 (Iowa 1978)). The legal test is met here because Iowa Code section 707.4 explicitly provides "[v]oluntary manslaughter is an included offense under an indictment for murder in the first or second degree." Iowa Code § 707.4;[1] *accord State v. Inger*, 292 N.W.2d 119, 121–22 (Iowa

---

[1]The general assembly made nonsubstantive, technical amendments to Iowa Code section 707.4 during its 2013 legislative session, breaking the statutory provision into four subsections. *See* 2013 Iowa Legis. Serv. ch. 90, § 224 (West 2013). This

1980) ("By the second paragraph of section 707.4, the legislature has seen fit to make voluntary manslaughter a lesser included offense in second-degree murder. Therefore, the 'legal' test . . . is satisfied."). But, Thompson fails to meet the factual test.

Determining whether a lesser included offense meets the factual test involves " 'an ad hoc determination whether there is a factual basis in the record for submitting the included offense to the jury.' " *Sangster*, 299 N.W.2d at 663 (quoting *Furnald*, 263 N.W.2d at 752). A factual basis exists if the defendant has produced "substantial evidence of each necessary element of the lesser-included offense[]." *State v. Royer*, 436 N.W.2d 637, 643 (Iowa 1989).

Section 707.4 provides:

> A person commits voluntary manslaughter when that person causes the death of another person, under circumstances which would otherwise be murder, if the person causing the death acts solely as the result of sudden, violent, and irresistible passion resulting from *serious provocation* sufficient to excite such passion in a person and there is not an interval between the provocation and the killing in which a person of ordinary reason and temperament would regain control and suppress the impulse to kill.

Iowa Code § 707.4 (emphasis added).

In *Inger*, we explained that "[s]ection 707.4 requires that both a subjective standard and objective standards be met before a defendant can be convicted of voluntary manslaughter." 292 N.W.2d at 122. We elaborated:

> The subjective requirement of section 707.4 is that the defendant must act solely as a result of sudden, violent, and irresistible passion. The sudden, violent, and irresistible

---

provision can be found in Iowa Code section 707.4(3) (West, Westlaw current with legislation from the 2013 Reg. Sess.).

passion must result from serious provocation sufficient to excite such passion in a reasonable person. This is an objective requirement. It is also necessary, as a final objective requirement, that there is not an interval between the provocation and the killing in which a person of ordinary reason and temperament would regain his or her control and suppress the impulse to kill.

*Id.*

The district court declined to give the voluntary manslaughter instruction because there was insufficient evidence of the first objective requirement—that "[t]he sudden, violent, and irresistible passion . . . result[ed] from serious provocation sufficient to excite such passion in a reasonable person." *Id.* Thompson presented evidence that Gabel had slapped him, was arguing with him, and had given him "the finger" before he shot her. In *Inger*, we recognized that evidence the victim assaulted the defendant could be sufficient to establish serious provocation. *Id.* We summarized the evidence in that case as follows:

> Defendant testified that decedent attempted to strike him, thereby inducing defendant to swing at [decedent] out of fear or anger. Other evidence showed [decedent] then hit defendant in the head with his fist. [Decedent] somehow fell down against a metal pole supporting the grocery store and, while [the decedent] was down, defendant quickly kicked [decedent] in the head.

*Id.* (citations omitted). We concluded "[d]efendant's own testimony provide[d] a sufficient factual basis to meet the *subjective* requirement that the defendant acted solely as a result of sudden, violent, and irresistible passion." *Id.* (emphasis added).

Additionally, words alone, historically, have been insufficient to provide a factual basis for serious provocation. *See, e.g., State v. Rutledge*, 243 Iowa 179, 192, 47 N.W.2d 251, 259 (1951). Thompson contends, however, that some jurisdictions are beginning to reevaluate the historical approach. In support of this proposition, Thompson cites

Wayne R. LaFave's treatise, *Substantive Criminal Law.* According to this treatise, some courts have recognized that words alone may be sufficient to establish provocation if the words are informational (conveying information of a fact that constitutes a reasonable provocation when that fact is observed) rather than merely insulting or abusive words. 2 Wayne R. LaFave, *Substantive Criminal Law* § 15.2(b)(6), at 499–500 (2d ed. 2003). Two of the cases cited in support of this proposition involved a defendant being told that the victim had assaulted a close relative. *See id.* at n.60 (citing *State v. Copling*, 741 A.2d 624, 631–32 (N.J. Super. Ct. App. Div. 1999) (noting "a person can be provoked without actually witnessing the provoking assault on the relative" while analyzing whether defendant, whose mother told him the victim had attacked defendant's younger brother, was provoked), and *Commonwealth v. Berry*, 336 A.2d 262, 263–65 (Pa. 1975) (holding jury could find defendant was provoked when, arriving on the scene shortly after the attack, his mother told him she had been assaulted by man defendant then killed)). Those cases are inapposite because the words Gabel used were "merely insulting or abusive"—she did not tell Thompson she had assaulted anyone close to him.

We agree with the district court that Gabel's actions in slapping him and insulting him with obscene gestures fell short of the objectively serious provocation required to submit a voluntary manslaughter instruction. *See State v. Ballinger*, No. 79974, 2002 WL 962835, at *6 (Ohio Ct. App. May 2, 2002) (holding "trial court did not err in refusing to instruct on the inferior offense of voluntary manslaughter" when victim slapped defendant and may have accidentally come into contact with defendant's infant daughter and called defendant a bitch).

Finally, the State argues Thompson had time to think twice and calm down. After Gabel gave him the finger through the car window fifteen to twenty feet away, he walked from the outside deck to his bedroom to get the rifle and returned to the deck to shoot her. But, given our holding that provocation was insufficient, we need not decide whether this was a sufficient interval for a "person of ordinary reason and temperament [to] regain his or her control and suppress the impulse to kill." *Inger*, 292 N.W.2d at 122. Accordingly, we affirm the district court's refusal to submit an instruction on voluntary manslaughter.

**B. Exclusion of Hearsay Evidence.** Thompson appeals the district court's exclusion of hearsay evidence showing that on an earlier occasion Gabel threatened him with a firearm. Specifically, the district court excluded testimony from his friend Joseph Christen that Thompson told him thirty to forty-five days earlier that Gabel had aimed a revolver at him the same morning. The district court also excluded testimony from Gabel's daughter that Gabel told her about putting a gun to Thompson's head. We conclude after reviewing the record that this evidence was correctly excluded as hearsay. Thompson did not lay a foundation to admit the evidence under any exception to the hearsay rule.

Thompson also claims the district court erroneously excluded evidence supporting his PTSD defense. The evidence includes correspondence Thompson sent from Iraq describing his war experiences. The State responds that the district court correctly excluded his letters as hearsay. We agree. Thompson failed to lay a foundation supporting any exception to the hearsay rule such as present sense impression or then existing mental, emotional, or physical state of mind. *See* Iowa R. Evid. 5.803(1), (3). For example, Thompson never showed the letters

were written while he was "perceiving the event . . . or immediately thereafter." *See id.* r. 5.803(1). For the same reasons, the district court correctly excluded testimony from Thompson's brothers, Tyler and Cristen, regarding the letters.

Moreover, after carefully reviewing the record, we conclude that any error in excluding this evidence was harmless. Tyler was allowed to testify regarding defendant's reports of his war experiences. The State did not dispute that Thompson suffered from PTSD. A defense expert was allowed to testify regarding the content of the letters. In any event, the evidence of guilt was overwhelming. Thompson's videotaped confession includes his admissions that he intentionally shot Gabel the second time to "put her out of her misery." Accordingly, Thompson was not entitled to a new trial. *See State v. Howard*, 825 N.W.2d 32, 41–42 (Iowa 2012) (noting evidentiary error is harmless when State establishes overwhelming evidence of guilt).

We affirm the district court's evidentiary rulings and denial of Thompson's motion for a new trial.

**C. Thompson's Request for Gabel's Mental Health Records.** Thompson challenges the district court's denial of his application to obtain and review in camera Gabel's mental health records. We must decide whether section 622.10(4) or *Cashen* governed this request. Thompson argues on appeal that section 622.10(4) is unconstitutional under the Iowa Constitution to the extent the statute makes it more difficult for a defendant to obtain potentially exculpatory evidence from a victim's mental health records than it would be under the protocol set

forth in *Cashen.*[2]  We begin by comparing the *Cashen* and statutory approaches to frame the constitutional analysis.

1. *The* Cashen *protocol.*  Ross Cashen was charged with domestic abuse assault and willful injury, class "D" felonies with potential ten-year prison sentences.  *Cashen,* 789 N.W.2d at 404–05.  He claimed self-defense.  *Id.* at 404.  Cashen argued the mental health records of the victim, Jane Doe, were relevant to her credibility and to show her "propensity for violence."  *Id.*  He had already acquired some of her records and sought more.  *Id.*  The state moved in limine, arguing her records were inadmissible.  *Id.*  The district court denied the motion and ruled the records were relevant to Cashen's claim of self-defense and Doe's credibility.  *Id.*  We granted the state's application for discretionary review and transferred the case to the court of appeals, which affirmed in part but failed to address the discovery procedure for mental health records.  *Id.* at 404–05. We granted further review.  *Id.* at 405.

The state argued the psychotherapist privilege prevented " 'intrusion into the victim's mental health records' " and, alternatively, that any disclosure should be limited.  *Id.*  Cashen argued his constitutional right to a fair trial supported compelled access to confidential records that may contain exculpatory evidence.  *Id.* at 414

---

[2]Thompson did not challenge the constitutionality of section 622.10(4) in district court.  On appeal, Thompson contends his trial counsel was ineffective because he failed to challenge the constitutionality of the statute under the Iowa Constitution. Thompson concedes the statute complies with the United States Constitution, but contends it violates his right to a fair trial and to present a defense under the due process clause of the Iowa Constitution.  We find the record adequate to decide this issue on direct appeal.  His facial challenge to the constitutionality of the statute is a question of law.  Because we conclude the statute is constitutional and reject his facial challenge, his ineffective-assistance claim necessarily fails for lack of prejudice.  *See* *State v. Elston,* 735 N.W.2d 196, 200 (Iowa 2007) ("[I]f the record is sufficient to decide [an ineffective-assistance-of-counsel] claim[], we will do so on direct appeal.").

(Cady, J., dissenting). Our court reviewed precedent employing "a balancing test to determine if a party to a proceeding is entitled to review the confidential medical records of a nonparty." *Id.* at 405–07 (majority opinion). We recognized patients have a qualified, rather than an absolute, "constitutional right to privacy in their medical records." *Id.* at 406. And we recognized "a criminal defendant has a due process right to present evidence to a jury that might influence the jury's determination of guilt." *Id.* at 407 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S. Ct. 989, 1000–01, 94 L. Ed. 2d 40, 56–57 (1987)).

The *Cashen* court took the opportunity to "set forth the proper protocol to be used by a court to determine when and how a defendant's attorney can gain access to a victim's privileged mental health records." *Id.* at 405. "We . . . emphasize[d] that a defendant is not entitled to engage in a fishing expedition when seeking a victim's mental health records." *Id.* at 408. Then, we outlined a five-step protocol. *Id.* at 408–10. First, the defendant must file a confidential motion "demonstrating a good faith factual basis that the records sought contain evidence relevant to the defendant's innocence." *Id.* at 408. Second, the county attorney notifies and confers with the victim. *Id.* "If the victim consents to the disclosure, the court shall issue a subpoena for the records to be produced under seal to the court." *Id.* If the victim objects, the court is to "hold a hearing to determine if a reasonable probability exists that the records contain exculpatory evidence tending to create a reasonable doubt as to the defendant's guilt" and, if so, "issue[s] a subpoena for the records to be produced under seal to the court." *Id.* The court is to enter a protective order before issuing the subpoena. *Id.* at 408–09. Third, once the records are obtained, the defendant's attorney, not the judge, inspects the records at the courthouse. *Id.* at 409. Fourth, if defense

counsel identifies exculpatory information, the county attorney and the court are notified and prior to a hearing, the county attorney is given the opportunity to review the identified records. *Id.* Fifth, the court holds a closed hearing to determine whether the information is exculpatory and, if so, allows use, subject to a protective order. *Id.*

We expressly declined to require "a showing that the information sought in the records could not be obtained from another source, such as the victim's testimony, before the defendant is allowed to seek production of the victim's mental health records." *Id.* at 410. We concluded Cashen had made the threshold showing and remanded with instructions for issuance of a subpoena for Doe's mental health records. *Id.* at 410–11.

Justice Cady dissented. His dissenting opinion foreshadowed the controversy *Cashen* engendered:

> The majority adopts one of the weakest tests known to the law in an area of the law that deals with the clash of two of the most compelling and venerable interests known to the law. This is a step backwards. It gives the defendant more power than necessary to protect the right to a fair trial, while presenting a serious risk of a different form of abuse for victims of domestic violence. This new test may also ultimately cause victims to decline to report domestic abuse in order to protect themselves from being required to disclose very personal and private information to the alleged abusers and other parties to the prosecution.

*Id.* at 411 (Cady, J., dissenting). Others raised the same concerns. *See, e.g.,* Caroline K. Bettis, Note, *Adding Insult to Injury: How the* Cashen *Protocol Fails to Properly Balance Competing Constitutional Interests of Iowans,* 60 Drake L. Rev. 1151 (2012) [hereinafter Bettis].

The *Cashen* dissent concluded as follows:

> The new test developed by the majority may be easy and beneficial to defendants, but it is a step back both for victims and for the progress made in addressing domestic

violence over the last decade. The only way victims of domestic abuse with a history of counseling will be able to ensure the confidentiality of their private counseling records is to not report domestic abuse. The law should be able to do better.

789 N.W.2d at 417. The legislature responded in its next session. We must interpret the resulting statutory enactment mindful of the legislature's purpose to supersede the *Cashen* test with a protocol that restores protection for the confidentiality of counseling records while also protecting the due process rights of defendants. *See State v. Walker*, 804 N.W.2d 284, 290 (Iowa 2011) (" 'We seek a reasonable interpretation which will best effectuate the purpose of the statute . . . .' " (quoting *State v. Johnson*, 528 N.W.2d 638, 640 (Iowa 1995))); *id.* at 293–94 (noting our court's " 'mandate to construe statutes in a fashion to avoid a constitutional infirmity where possible' " (quoting *In re Young*, 780 N.W.2d 726, 729 (Iowa 2010)).

2. *The constitutionality of section 622.10(4).* While murder charges were pending against Thompson, the Iowa legislature, in reaction to *Cashen*, passed Senate File 291. 2011 Iowa Acts ch. 8, § 2. The law took effect upon its enactment on March 30, 2011. 2011 Iowa Acts ch. 8, § 3. Senate File 291 amended section 622.10 by adding the following subsection:

4. *a.* Except as otherwise provided in this subsection, the confidentiality privilege under this section shall be absolute with regard to a criminal action and this section shall not be construed to authorize or require the disclosure of any privileged records to a defendant in a criminal action unless either of the following occur:

(1) The privilege holder voluntarily waives the confidentiality privilege.

(2)(a) The defendant seeking access to privileged records under this section files a motion demonstrating in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a

compelling need for the defendant to present a defense in the case. Such a motion shall be filed not later than forty days after arraignment under seal of the court. Failure of the defendant to timely file such a motion constitutes a waiver of the right to seek access to privileged records under this section, but the court, for good cause shown, may grant relief from such waiver.

(b) Upon a showing of a reasonable probability that the privileged records sought may likely contain exculpatory information that is not available from any other source, the court shall conduct an in camera review of such records to determine whether exculpatory information is contained in such records.

(c) If exculpatory information is contained in such records, the court shall balance the need to disclose such information against the privacy interest of the privilege holder.

(d) Upon the court's determination, in writing, that the privileged information sought is exculpatory and that there is a compelling need for such information that outweighs the privacy interest of the privilege holder, the court shall issue an order allowing the disclosure of only those portions of the records that contain the exculpatory information. The court's order shall also prohibit any further dissemination of the information to any person, other than the defendant, the defendant's attorney, and the prosecutor, unless otherwise authorized by the court.

*b.* Privileged information obtained by any means other than as provided in paragraph "*a*" shall not be admissible in any criminal action.

Iowa Code § 622.10(4) (Supp. 2011)).

Thompson argues section 622.10(4) is unconstitutional on its face because the *Cashen* protocol sets the constitutional floor for criminal defendants' access to the potentially exculpatory mental health records of their alleged victims. Thompson focuses on three key differences between the *Cashen* protocol and section 622.10(4). First, the statute requires a stronger threshold showing to obtain mental health records for an in camera inspection. *Compare id.* § 622.10(4)(*a*)(2)(a) (requiring defendant to establish "a reasonable probability that the information sought is likely to contain exculpatory information . . . for which there is

a compelling need for the defendant to present a defense in the case"), *with Cashen,* 789 N.W.2d at 408 (majority opinion) (requiring defendant to show there is "a reasonable probability the records sought contain exculpatory evidence tending to create a reasonable doubt as to the defendant's guilt").[3]  Second, the statute requires the information be unavailable "from any other source"—a hurdle omitted under *Cashen. Compare* Iowa Code § 622.10(4)(*a*)(2)(a), *with Cashen,* 789 N.W.2d at 410 (rejecting such a requirement).  Third, under *Cashen,* the initial in camera inspection is performed by defense counsel while under the statute the district court first reviews the records in camera to identify exculpatory information.  *Compare Cashen,* 789 N.W.2d at 409 ("[T]he attorney for the defendant who obtained the subpoena shall have the right to inspect the records at the courthouse.  An in camera review of the records by the court is insufficient."), *with* Iowa Code § 622.10(4)(*a*)(2)(b) ("[T]he court shall conduct an *in camera* review of [the] records to determine whether exculpatory information is contained in [the] records.").  We must determine whether these statutory requirements on their face violate the due process rights of criminal defendants.

---

[3]*Cashen* describes the showing the defendant must make under the first step in three different ways: (1) "a reasonable basis to believe the records are likely to contain exculpatory evidence tending to create a reasonable doubt as to the defendant's guilt"; (2) "a good faith factual basis that the records sought contain evidence relevant to the defendant's innocence"; and (3) "specific facts establishing a reasonable probability the records sought contain exculpatory evidence tending to create a reasonable doubt as to the defendant's guilt." *Cashen*, 789 N.W.2d at 408.  Presuming "reasonable basis," "good faith factual basis," and "specific facts establishing a reasonable probability" are all equivalent, the primary difference between these standards is that under *Cashen* the evidence must *tend* to create a reasonable doubt, whereas under the statute the defendant must establish a "compelling need" for the evidence.

Before we address those fighting issues, we reiterate the well-settled rules governing constitutional challenges to Iowa statutes:

> "We review constitutional challenges to a statute de novo. In doing so, we must remember that statutes are cloaked with a presumption of constitutionality. The challenger bears a heavy burden, because it must prove the unconstitutionality beyond a reasonable doubt. Moreover, 'the challenger must refute every reasonable basis upon which the statute could be found to be constitutional.' Furthermore, if the statute is capable of being construed in more than one manner, one of which is constitutional, we must adopt that construction."

*State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005) (quoting *State v. Hernandez-Lopez*, 639 N.W.2d 226, 233 (Iowa 2002) (citations omitted)); *see also* Iowa Code § 4.4(1) (2013) ("In enacting a statute, it is presumed that . . . [c]ompliance with the Constitutions of the state and of the United States is intended.").[4] We also reiterate the importance of maintaining confidentiality in mental health treatment:

> "Psychotherapy probes the core of the patient's personality. The patient's most intimate thoughts and emotions are exposed during the course of the treatment. The psychiatric patient confides [in his therapist] more utterly than anyone else in the world. . . . [H]e lays bare his entire self, his dreams, his fantasies, his sin, and his shame. The patient's innermost thoughts may be so frightening, embarrassing, shameful or morbid that the patient in therapy will struggle to remain sick, rather than to reveal those thoughts even to himself. The possibility that the psychotherapist could be compelled to reveal those communications to anyone . . . can deter persons from seeking needed treatment and destroy treatment in progress."

---

[4]The mental health records in this case involve Gabel's treatment in Wisconsin while she was an Illinois resident. We apply Iowa law because no party argues the law of Illinois or Wisconsin governs Thompson's access to Gabel's mental health records to defend against criminal charges in Iowa. *See In re Estate of Whalen*, 827 N.W.2d 184, 188 n.2 (Iowa 2013) ("Iowa law [applies] when no party pleads and proves that a foreign law governs." (citing *Talen v. Emp'rs Mut. Cas. Co.*, 703 N.W.2d 395, 409 (Iowa 2005))).

*McMaster v. Iowa Bd. of Psychology Exam'rs*, 509 N.W.2d 754, 758 (Iowa 1993) (quoting *Haw. Psychiatric Soc'y v. Ariyoshi*, 481 F. Supp. 1028, 1038 (D. Haw. 1979) (citations omitted)); *cf. Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 816 n.43 (D.C. 2003) ("[I]t is especially likely that a therapist's disclosure of highly personal information revealed by a patient who feels vulnerably exposed during therapy sessions would cause serious emotional distress.").

We begin our analysis with the threshold showing required to subpoena and review mental health records. Under *Cashen*, records may be subpoenaed for review by defense counsel if the defendant shows "a good faith factual basis that the records sought contain evidence relevant to the defendant's innocence." *Cashen*, 789 N.W.2d at 408. By contrast, the statute requires defendant to show

> in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case.

Iowa Code § 622.10(4)(*a*)(2)(a). "We are obligated to presume statutes to be constitutional, and we are further obligated to give them any reasonable construction possible to make them constitutional." *State v. Wiederien*, 709 N.W.2d 538, 544 (Iowa 2006). We give the words of the statute "their ordinary and common meaning by considering the context within which they are used." *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). In drafting section 622.10(4)(*a*)(2)(a), "the legislature employed language that invokes traditional legal standards with definitions commonly assigned in our jurisprudence." *See State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 44 (Iowa 2013). We reiterate that it is "our mandate to construe statutes in a fashion to avoid a

constitutional infirmity where possible." *In re Young*, 780 N.W.2d at 729. But, we cannot use the doctrine of constitutional avoidance to change the meaning of unambiguous statutory language. *Id.*

The first term in the statutory threshold requirement is "good faith," which " 'has various meanings; sometimes it is viewed objectively and at other times, subjectively.' " *City of Riverdale v. Diercks*, 806 N.W.2d 643, 656 (Iowa 2011) (quoting *Sieg Co. v. Kelly*, 568 N.W.2d 794, 804 (Iowa 1997)). We define "good faith" subjectively to mean "honest motive" when the term is paired with an objective term such as "reasonable." *Id.* at 656–57. Here, the requirement to show "in *good faith* a reasonable probability" means the district court must find defendant has an honest motive or purpose to seek the records. Accordingly, the district court should deny the motion upon a finding the defendant has a dishonest, bad-faith motive, such as to deter the victim from testifying against him.

The next term is "reasonable probability," which we have defined in an analogous setting to mean "a 'substantial,' not 'just conceivable,' likelihood." *State v. Madsen*, 813 N.W.2d 714, 727 (Iowa 2012) (quoting *King v. State*, 797 N.W.2d 565, 572 (Iowa 2011)) (discussing showing of prejudice required for an ineffective-assistance-of-counsel claim). The term "likely" in turn "means 'probable or reasonably to be expected.' " *In re B.B.*, 826 N.W.2d 425, 433 (Iowa 2013) (quoting *In re Oseing*, 296 N.W.2d 797, 801 (Iowa 1980)); *see also Black's Law Dictionary* 834, 1081 (5th ed. 1979) (defining "likely" to mean "probable," which in turn is defined as "[h]aving more evidence for than against").

We decline at this juncture to explicate the phrase "not available from any other source and for which there is a compelling need for the defendant to present a defense in the case." Iowa Code

§ 622.10(4)(*a*)(2)(a). We give those terms their ordinary meaning. *Auen*, 679 N.W.2d at 590. We leave it to case-by-case adjudication to determine on a particular factual record whether the information sought from privileged mental health records is "available from any other source." Today, for example, in *State v. Neiderbach*, we hold the district court erred by concluding under the circumstances of that case that the defendant failed to show the information was "not available from any other source" because he failed to take the deposition of the privilege-holding codefendant. 837 N.W.2d 180, 198 (Iowa 2013). Moreover, whether a defendant shows a "compelling need" for information is best determined under the factual record of each case. *See Cashen*, 789 N.W.2d at 415 (Cady, J., dissenting) (noting a balancing test "focuses on all the facts and circumstances of each case to fully assess a compelling need for the information").

We first address the constitutionality of the initial threshold requirement that the defendant show "a reasonable probability that the information sought is likely to contain exculpatory information." Iowa Code § 622.10(4)(*a*)(2)(a). In *Commonwealth v. Barroso*, the Kentucky Supreme Court surveyed cases addressing a criminal defendant's constitutional right to obtain access to a witness's mental health records. 122 S.W.3d 554, 558–64 (Ky. 2003). The court noted that *Ritchie* involved records held by a state agency governed by a *Brady*[5] analysis inapplicable to determining the threshold standard required to subpoena records from a third party. *Id.* at 559–60. The *Barroso* court observed that a

---

[5]*Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

majority of the state courts that have addressed this issue have held that a criminal defendant, upon a preliminary showing that the records *likely contain exculpatory evidence,* is entitled to some form of pretrial discovery of a prosecution witness's mental health treatment records . . . .

*Id.* at 561 (emphasis added). The *Barroso* court held that the defendant's constitutional rights are satisfied by authorizing an "*in camera* review of a witness's psychotherapy records . . . upon receipt of evidence sufficient to establish a reasonable belief that the records contain exculpatory evidence." *Id.* at 564.

Maryland's highest court held that "to require disclosure at trial of privileged records, a defendant must establish a reasonable likelihood that the privileged records contain exculpatory information necessary for a proper defense." *Goldsmith v. State*, 651 A.2d 866, 877 (Md. 1995). The Michigan Supreme Court requires a defendant to show a "reasonable probability that the privileged records are likely to contain material information necessary to his defense." *People v. Stanaway*, 521 N.W.2d 557, 562 (Mich. 1994). The New Hampshire Supreme Court requires the defendant to "establish a reasonable probability that the records contain information that is material and relevant to his defense." *State v. King*, 34 A.3d 655, 658 (N.H. 2011). The Wisconsin Supreme Court, recognizing the "strong public policy favoring protection of the counseling records," requires a defendant to "show a 'reasonable likelihood' that the records contain relevant information necessary to a determination of guilt or innocence." *State v. Green*, 646 N.W.2d 298, 309–10 (Wis. 2002). The foregoing threshold requirements found constitutional by these state supreme courts are similar to the initial showing required under the Iowa statute. *See* Iowa Code § 622.10(4)(*a*)(2)(a) (requiring defendant to show "a reasonable probability that the information sought is likely to contain exculpatory information"). Based on the foregoing authorities, we reject

Thompson's facial challenge to the statutory requirement that the defendant show "a reasonable probability that the information sought is likely to contain exculpatory information."

We next address defendant's constitutional challenge to the statutory requirement that the in camera review be performed by the court, not defense counsel. *Id.* § 622.10(4)(*a*)(2)(b). *Cashen* relied on *Ritchie* for the due process right to access exculpatory information in privileged records. *Cashen,* 789 N.W.2d at 407 (citing *Ritchie,* 480 U.S. at 56, 107 S. Ct. at 1000–01, 94 L. Ed. 2d at 56–57). Accordingly, we look to *Ritchie* for the scope of that right. *See State v. Allen,* 690 N.W.2d 684, 690 (Iowa 2005) ("[P]ast construction of the federal constitution . . . is persuasive in our interpretation of the corresponding provisions of the Iowa Constitution.").

In *Ritchie,* the defendant was found guilty by a jury of sexually abusing his thirteen-year-old daughter. 480 U.S. at 43, 45, 107 S. Ct. at 994–95, 94 L. Ed. 2d at 48–49. Her report of child abuse was investigated by a state agency, Pennsylvania Children and Youth Services (CYS). *Id.* at 43, 107 S. Ct. at 994, 94 L. Ed. 2d at 48. Defense counsel subpoenaed the CYS records. *Id.* The agency objected, citing a statutory privilege. *Id.* The trial court refused to order production of the CYS records to the defendant and did not fully review the CYS file. *Id.* at 44, 107 S. Ct. at 994, 94 L. Ed. 2d at 49. The Pennsylvania Supreme Court vacated the conviction and remanded the case for an in camera review of the CYS records by defense counsel. *Id.* at 45, 107 S. Ct. at 995, 94 L. Ed. 2d at 49–50. The U.S. Supreme Court granted certiorari. *Id.* at 46, 107 S. Ct. at 995, 94 L. Ed. 2d at 50.

The *Ritchie* Court held that the defendant was entitled under the Due Process Clause to an in camera review of the CYS records by the

trial court. *Id.* at 58, 107 S. Ct. at 1001–02, 94 L. Ed. 2d at 58. A five-justice majority, however, held that the defense counsel was not entitled to conduct his own in camera review of the CYS records in light of the state's compelling interest in the confidentiality of child abuse information. *Id.* at 60, 107 S. Ct. at 1002–03, 94 L. Ed. 2d at 59. The majority concluded:

> We disagree with the decision of the Pennsylvania Supreme Court to the extent that it allows defense counsel access to the CYS file. An *in camera* review by the trial court will serve Ritchie's interest without destroying the Commonwealth's need to protect the confidentiality of those involved in child-abuse investigations.

*Id.* at 61, 107 S. Ct. at 1003, 94 L. Ed. 2d at 60. Thus, under *Ritchie*, the criminal defendant does not have a federal due process right to an in camera inspection by his own lawyer. Rather, the in camera inspection is to be by the trial judge. *Id.*

Thompson nevertheless argues we should find broader rights of access under the due process clause of the Iowa Constitution, relying on *Cashen.* In *Cashen,* however, we merely cited to *Ritchie* without any separate citation or analysis of the Iowa Constitution's due process clause. *See Cashen,* 789 N.W.2d at 405, 407, 408. *Ritchie* squarely holds that review by the trial judge, rather than by defense counsel, is *constitutionally* sufficient. 480 U.S. at 61, 107 S. Ct. at 1003, 94 L. Ed. 2d at 60. We agree. There are sound reasons to refrain from reaching a different conclusion under the Iowa Constitution. The *Cashen* majority made a policy choice to allow defense counsel to conduct the in camera review without stating that procedure is constitutionally required. We hold that it is not. Less than a year later, the Iowa legislature made a different policy choice—to substitute the trial judge for defense counsel for the in camera inspection. We decline to make new

law under the Iowa due process clause to redraw the constitutional boundaries to strike down the legislature's policy choice.

*Cashen* relied on a Massachusetts case adopting a similar protocol requiring defense counsel to perform the initial review of the records. *Cashen*, 789 N.W.2d at 409 (citing *Commonwealth v. Dwyer*, 859 N.E.2d 400, 418 (Mass. 2006)). The *Dwyer* court stated this protocol "is not constitutionally compelled." 859 N.E.2d at 419. The constitutional argument made by Thompson was rejected in *Ritchie*:

> A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files. Although the eye of an advocate may be helpful to a defendant in ferreting out information, this Court has never held—even in the absence of a statute restricting disclosure—that a defendant alone may make the determination as to the materiality of the information. Settled practice is to the contrary. In the typical case where a defendant makes only a general request for exculpatory material under *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.

*Ritchie*, 480 U.S. at 59, 107 S. Ct. at 1002, 94 L. Ed. 2d at 58–59 (footnote and citations omitted). Although we agree "the eye of an advocate may be helpful to a defendant in ferreting out information," that role is not constitutionally mandated. Nor should it be when a neutral trial judge can perform the review.

The *Cashen* majority stated, "Only the attorneys representing the parties know what they are looking for in the records. The court cannot foresee what may or may not be important to the defendant." *Cashen*, 789 N.W.2d at 409. Yet, we repeatedly emphasized in *Cashen* that defendants are not permitted to embark on a "fishing expedition" through

confidential mental health records. *Id.* at 407–08. We believe that a defense counsel who is not merely "fishing" should be able to articulate to the district court specifically what information is being sought and why. With that guidance, we trust Iowa district court judges will be able to recognize exculpatory information when they see it.

A powerful counterbalance to the pretrial discovery rights of a defendant is the victim–patient's constitutional right to privacy in her mental health records. *See id.* at 406 (recognizing patients have "a constitutional right to privacy in their medical records"). The legislature was entitled to choose to have a neutral judge review the victim's private records, rather than the advocate for the alleged abuser. The *Ritchie* Court observed that the state's interests in protecting confidential child-abuse information would be undermined by allowing defense counsel to review records for relevancy:

> To allow full disclosure to defense counsel in this type of case would sacrifice unnecessarily the Commonwealth's compelling interest in protecting its child-abuse information. If the CYS records were made available to defendants, even through counsel, it could have a seriously adverse effect on Pennsylvania's efforts to uncover and treat abuse. Child abuse is one of the most difficult crimes to detect and prosecute, in large part because there often are no witnesses except the victim. A child's feelings of vulnerability and guilt and his or her unwillingness to come forward are particularly acute when the abuser is a parent. It therefore is essential that the child have a state-designated person to whom he may turn, and to do so with the assurance of confidentiality. Relatives and neighbors who suspect abuse also will be more willing to come forward if they know that their identities will be protected. Recognizing this, the Commonwealth—like all other States—has made a commendable effort to assure victims and witnesses that they may speak to the CYS counselors without fear of general disclosure. The Commonwealth's purpose would be frustrated if this confidential material had to be disclosed upon demand to a defendant charged with criminal child abuse, simply because a trial court may not recognize exculpatory evidence. Neither precedent nor common sense requires such a result.

*Ritchie*, 480 U.S. at 60–61, 107 S. Ct. at 1003, 94 L. Ed. 2d at 59–60 (footnote omitted). Accordingly, the U.S. Supreme Court held that the defendant's "interest (as well as that of the Commonwealth) in ensuring a fair trial can be fully protected" through an in camera inspection by the trial court alone, even though "this rule denies [the defendant] the benefits of 'an advocate's eye.'" *Id.* at 60, 107 S. Ct. at 1002–03, 94 L. Ed. 2d at 59. We agree.

The cost of second-guessing the legislature's sound policy choices in section 622.10(4) would be high. As Justice Cady observed:

> If victims of domestic violence must suffer the embarrassing and debilitating loss of their physician–patient privilege once they become a witness in a criminal domestic-abuse prosecution, a chilling effect will be cast over the reporting of domestic abuse, the disclosure of information to treatment providers by victims, the ability of physicians and psychotherapists to treat psychological disorders arising from domestic abuse, and the willingness of victims to testify against their abusers.

*Cashen*, 789 N.W.2d at 416 (Cady, J., dissenting). A commentator elaborated on the mind-set of victims who learn their attacker's lawyer will review their private mental health records:

> Consider the circumstance of a woman who has been raped. The crime itself likely has had a traumatic, shattering, and destructive impact on her ability to live the life she had before it was committed. In an effort to deal with and recover from her ordeal, she has undergone counseling, during which she may have disclosed information, thoughts, fears, and self-doubts of the most intensely personal and private kind. It is bad enough that, come the trial, she must relive her ordeal before an audience of strangers, and that the judge will examine her records to determine whether they contain information that must be disclosed to the defense. In Massachusetts, however, she must take the witness stand knowing that her rapist's lawyer, whose primary responsibility is to attack her testimony, credibility and character, has read the entire file of her counseling. The lawyers in the case may have every confidence that defense counsel has adhered and will adhere to the rules. To the witness, by contrast, this may provide little comfort

compared to the sense of betrayal, humiliation, and exposure she is likely to experience.

Clifford S. Fishman, *Defense Access to a Prosecution Witness's Psychotherapy or Counseling Records*, 86 Or. L. Rev. 1, 33 (2007) [hereinafter Fishman]; *accord* Bettis, 60 Drake L. Rev. at 1202 ("When a victim discovers that records are being sought by an alleged attacker, this alone will likely re-traumatize the victim.").

Finally, in light of the importance of maintaining confidentiality, we hold the legislature could constitutionally require the defendant to show the information sought in the victim's mental health records is "not available from any other source." Iowa Code § 622.10(4)(*a*)(2)(b). This statutory requirement is constitutional on its face. Whether it is unconstitutional as applied must be determined on a case-by-case basis. Other "courts have held that, even if the requisite standard for in camera review has been established, the defendant is entitled to disclosure only if comparable evidence is 'unavailable from less intrusive sources.'" Fishman, 86 Or. L. Rev. at 50 & n.189 (collecting cases). Although the *Cashen* court made a policy choice to omit this requirement, it cited no authority for rejecting it. Thompson cites no case holding due process *requires* allowing the defendant to obtain the victim's privileged mental health records to obtain information that is available from other, less intrusive sources. The Kentucky Supreme Court held that exculpatory evidence found in the court's in camera review "must be disclosed to the defendant *if unavailable from less intrusive sources.*" *Barroso*, 122 S.W.3d at 564 (emphasis added).

Moreover, other state supreme courts have upheld *absolute* privileges against constitutional challenges by criminal defendants. *See, e.g., Crisis Connection, Inc. v. Fromme*, 949 N.E.2d 789, 802 (Ind. 2011).

In *Fromme*, the Indiana Supreme Court conducted a thorough analysis of federal and state caselaw. *Id.* at 795–802. In upholding the constitutionality of Indiana's victim–advocate privilege—an absolute privilege—the court concluded:

> In sum, by providing a complete ban to disclosure in cases like the present one, Indiana's victim advocate privilege advances the State's compelling interest in maintaining the confidentiality of information gathered in the course of serving emotional and psychological needs of victims of domestic violence and sexual abuse. For the reasons stated above, this interest is not outweighed by Fromme's right to present a complete defense. Accordingly, Fromme does not have a constitutional right to an *in camera* review of Crisis Connection's records. In the absence of a violation of Fromme's constitutional rights, we apply the victim advocate privilege as provided by the General Assembly.

*Id.* at 802. Thus, in *Fromme*, the Indiana Supreme Court held that the defendant's "right to present a complete defense" was outweighed by the compelling interest in serving the psychological and emotional needs of victims of domestic violence and sexual abuse. Here, our legislature has recognized a similar compelling interest in protecting the psychological and emotional needs of crime victims by limiting the disclosure of their mental health records. In doing so, the legislature has not created a new, absolute privilege as in Indiana; it has merely restricted the circumstances under which a traditional, long-recognized privilege may be overcome. This is within the legislature's power.

Let us examine the alternative. If we were to find that a criminal defendant has a general due process right to obtain otherwise privileged evidence, where would it end? Consider a case in which a victim of a serious violent crime gives somewhat inconsistent accounts as to what happened—a not uncommon occurrence. Could the crime victim's spouse be subpoenaed to testify under oath about what the victim told

him or her? *See* Iowa Code § 622.9 (recognizing the marital privilege in Iowa). Could the victim's priest be subpoenaed? *See id.* § 622.10(1) (recognizing the priest–penitent privilege). Could the victim's attorney be required to produce communications with the victim? *See id.* § 622.10(1) (recognizing the attorney–client privilege).

Reasonable minds may disagree over how best to balance the competing rights of criminal defendants and their victims. Our task is simply to decide whether the balance struck by the elected branches in section 622.10(4) is constitutional. We hold that section 622.10(4) is constitutional on its face and supersedes the *Cashen* protocol.

We next determine whether the district court correctly applied the statute.

3. *The confidentiality of mental health records survives the patient's death.* We begin our analysis with the observation that the confidentiality of Gabel's mental health records survives her death. *See Cashen,* 789 N.W.2d at 414–15 ("[T]he physician–patient privilege continues after death . . . ." (citing 1 Kenneth S. Broun, et al., *McCormick on Evidence* § 102, at 462 (6th ed. 2006)); *State v. Heemstra,* 721 N.W.2d 549, 563 (Iowa 2006) (noting medical privilege continued after patient's death); *cf. Bailey v. Chi., Burlington & Quincy R.R.*, 179 N.W.2d 560, 564 (Iowa 1970) ("[T]he protective shield provided by Code section 622.10 . . . generally survives the client's death, termination of the relationship, or dismissal of a case in litigation.").

Of course, the death of the patient is a fact to consider in balancing the rights of a criminal defendant to exculpatory information in confidential records. After all, "[t]he holder of the privilege has little private interest in preventing disclosure, because he is dead." *United States v. Hansen,* 955 F. Supp. 1225, 1226 (D. Mont. 1997); *accord*

*Cashen*, 789 N.W.2d at 414 (noting the "diminish[ed] . . . importance of protecting the records from disclosure" after the patient's death). Perversely, a defendant who kills his victim may have greater access to her mental health records than an abuser whose victim survives. The balancing of competing interests after the patient's death no longer includes the concern over revictimizing a specific living victim through the disclosure of her confidential records to her abuser's lawyer, or chilling the victim's ongoing counseling or incentive to report further abuse. But, the societal interest in the privacy of mental health records continues unabated regardless of the death of any individual victim. *See generally* Iowa Code ch. 228 (protecting privacy of mental health information); *Cashen*, 789 N.W.2d at 411–12 (discussing the fundamental importance of confidentiality in mental health treatment).

4. *Thompson failed to meet the threshold requirements to obtain Gabel's mental health records.* Thompson claimed he needed Gabel's mental health records to support his PTSD defense. He argued her records could contain information showing "she was prone to manipulation, violence and anger, all of which could exacerbate his PTSD symptoms." Thompson failed to show when Gabel received mental health treatment or why she was treated. The State resisted Thompson's motion for an in camera inspection. On September 14, 2011, the district court denied Thompson's motion upon determining he had made "no showing of a reasonable probability that the privileged records sought may likely contain exculpatory information not available from any other source, for which the defendant had a compelling need to present a defense." The district court found that "[f]acts regarding the victim's conduct relating to [the PTSD] defense have already been presented by

depositions" and other sources and were available to the defense expert. We agree.

Thompson offered no evidence showing a nexus between the issues at trial and the mental health treatment received by Gabel. He offered virtually no extrinsic evidence regarding the circumstances surrounding Gabel's involuntary hospitalization. When asked why her mother "checked in" to the hospital, Gabel's daughter simply said "because her— my grandma, her mom. Um, they just upset her to the point she thought she needed help, I guess." Thompson did not establish when the hospitalization occurred, or even whether Gabel and Thompson had a relationship at the time. Further, although Thompson asserted before the district court that the defendant's expert indicated that obtaining the records would be "very valuable," there was no affidavit or other evidence submitted from the expert on this point, but only the arguments of counsel.

Thompson's PTSD was not disputed. He did not plead self-defense. Gabel's mental state was not at issue. The jury heard evidence regarding the conduct of Thompson and Gabel the night he shot her, as well as evidence concerning the nature of their relationship. Thompson was not entitled to go on a fishing expedition in her mental health records. He already had what he needed. The district court correctly ruled Thompson failed to make the showing required for an in camera inspection under section 622.10(4).

**D. The Verdict Was Not Contrary to the Evidence.** Thompson moved for a new trial, in part, because "the verdict of guilty rendered by the jury was contrary to evidence." He claims on appeal the district court applied the wrong standard in denying his motion by stating "[t]he jury's verdict was supported by ample evidence in the record." On

appeal, Thompson relies on Iowa Rule of Criminal Procedure 2.24(2)(*b*)(6) and *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). However, Thompson's counsel never cited that rule or *Ellis* in his posttrial motion or during the hearing on that motion in district court. Rather, he argued Thompson was prejudiced by evidentiary errors, principally that his videotaped confession was admitted into evidence despite his intoxication—a ruling he does not challenge on appeal. We agree with the State that Thompson failed to preserve error on his claim the district court applied the wrong standard under rule 2.24(2)(*b*)(6).

In any event, we have already concluded that overwhelming evidence supported the guilty verdict. Accordingly, the district court did not abuse its discretion in denying Thompson's motion for new trial. *See Reeves*, 670 N.W.2d at 202 (noting our court's review of the district court's ruling as to whether the verdict was contrary to weight of the evidence is for abuse of discretion). We affirm the order denying Thompson's motion for new trial.

### IV. Conclusion.

For these reasons, we affirm the rulings of the district court and Thompson's conviction.

### AFFIRMED.

All justices concur except Cady, C.J., who concurs specially, and Appel, Wiggins, and Hecht, JJ., who separately concur specially.

**CADY, C.J. (concurring specially).**

I concur in the majority opinion, but write separately to express my view that the statutory standard for judicial review of confidential records under Iowa Code section 622.10(4) (Supp. 2011) should be given its definition through the application of facts on a case-by-case basis. As this case and *State v. Niederbach*, 837 N.W.2d 180, 194 (Iowa 2013), illustrate, the facts are what should breathe meaning into the "reasonable probability" standard, and this standard will continue to gain greater clarity in the future as additional cases continue to give it shape.

**APPEL, Justice (concurring specially).**

For the reasons expressed below, I concur only in the result in this case.

### I. Production of Mental Health Records.

**A. Positions of the Parties.** Thompson claims the district court erred in not ordering Angela Gabel's mental health records produced for in camera inspection. Thompson offered evidence Gabel was hospitalized in the past for mental health issues at Franciscan Skemp Medical Center in La Crosse, Wisconsin. Citing *State v. Heemstra*, 721 N.W.2d 549 (Iowa 2006), Thompson argues that if there was information in the mental health records suggesting that Gabel was manipulative, cruel, or mean, it could be valuable information for the defense's experts, who were asserting that, because of his posttraumatic stress disorder (PTSD), Thompson lacked the necessary intent to support a murder conviction.

The State responds that the request was simply too speculative. Defense counsel stated the deceased "might have been hospitalized," but could not give the approximate date of Gabel's purported hospitalization. According to the State, without some idea of the reasons for treatment and timeframe involved, Thompson could not demonstrate the required good faith belief that a reasonable probability existed that the records sought were likely to contain exculpatory information, or that the defense had a compelling need for the records. *See* Iowa Code § 622.10(4)(*a*)(2)(a) (Supp. 2011). Hence, the State contends Thompson did not establish what information in the medical records would help him in his defense. Without a more particularized knowledge of the contents of the mental health records, the State suggests, production of the documents is unjustified.

Further, the State claimed Thompson failed to demonstrate the information was unavailable from other sources. The State notes Thompson had been living with Gabel for at least two years prior to the time he killed her and argues he would be in a position to know if Gabel suffered from a mental illness. The State contends Thompson made no showing regarding an inquiry of the couples' friends that would have seen them interact.

**B. Proper Standard for Production.** Thompson challenges the constitutionality of Iowa Code section 622.10 on its face as recently amended by the Iowa legislature. For the reasons expressed in my special concurrence in *State v. Neiderbach*, 837 N.W.2d 180, 220, 223–37 (Iowa 2013) (Appel, J., concurring specially), I conclude Iowa Code section 622.10(4) is not unconstitutional on its face.[6]

---

[6]A reference has been made to "the controversy *Cashen* engendered" with a citation to a law review note that describes, among other things, the "Evils of the Heemstra Decision" in reference to this court's decision in *State v. Heemstra*, 721 N.W.2d 549 (Iowa 2006). *See* Caroline K. Bettis, Note, *Adding Insult to Injury: How the* Cashen *Protocol Fails to Properly Balance Competing Constitutional Interests of Iowans*, 60 Drake L. Rev. 1151, 1167 (2012). This note further references articles from the *Des Moines Register* for the proposition that our *Cashen* decision was controversial. *Id.* at 1187.

Decisions of our court, of course, are often controversial. It is not possible to avoid controversy in hotly contested cases as all potential resolutions are likely to be controversial in some quarters. Indeed, the recognition of the psychotherapist–patient privilege is subject to controversy. *See Jaffee v. Redmond*, 518 U.S. 1, 18, 116 S. Ct. 1923, 1932, 135 L. Ed. 2d 337, 350 (1996) (Scalia, J., dissenting) (caustically noting that "[t]he Court has discussed at some length the benefit that will be purchased by creation of the evidentiary privilege in this case: the encouragement of psychoanalytic counseling" and that "[i]t has not mentioned the purchase price: occasional injustice"). We decide our cases based upon facts and law and not upon perceptions of whether a decision will be viewed by some as controversial.

I also resist any implication that the legislative approach was "better" than the approach in *Cashen.* As stated in my *Neiderbach* special concurrence, the issue is not whether the approach of the legislature is better, or even worse, but whether the approach, on its face, meets the requirements of the United States and Iowa Constitutions. *State v. Neiderbach*, 837 N.W.2d 180, 220 (Iowa 2013) (Appel, J., concurring specially). Our view of what might be better policy is of no consequence.

One of the reasons for that conclusion, however, is that the threshold standard for production of mental health records is not overly demanding. The standard of "reasonable probability" in Iowa Code section 622.10(4)(*a*)(2) requires a plausible showing that the mental health records in the case may likely produce exculpatory evidence. *Id.* at 226. Further, any approach to the proper standard must recognize all of the statutory language, including "reasonable probability" and "may." *See* Iowa Code § 622.10(4)(*a*)(2)(b) (requiring the district court to conduct in camera review when the defendant has shown "a *reasonable probability* that the privileged record sought *may* likely contain exculpatory information that is not available from any other source" (emphasis added)). In addition, the proper interpretation of the statute must recognize the constitutional restraints described in *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987); *Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); and *United States v. Valenzuela-Bernal*, 458 U.S. 858, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). Finally, while characterization of the effort as a "fishing expedition" has emotional appeal, it cannot be a substitute for analysis of the specific request in the context of a specific case. *See Neiderbach*, 837 N.W.2d at 225 n.8.

---

*See State v. Mauti*, 33 A.3d 1216, 1229 (N.J. 2012) (stating that where the legislature has enacted a privilege, the court's "own conclusions about what would be better policy are simply of no consequence"); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. ___, ___, 132 S. Ct. 2566, 2600, 183 L. Ed. 2d 450, 490 (2012) (noting it is not the Court's role to pass upon the wisdom of the federal Affordable Care Act's requirement that individuals pay a tax if they do not obtain health insurance, but rather only upon its constitutionality). Any implication that certain policy preferences are relevant with respect to the constitutional issues in this case undermines the appearance of impartiality of judicial review.

Finally, although the statements are indirect and are plainly dicta, I disagree with any suggestion that exculpatory evidence in the trial of a defendant facing life in prison might be denied to the defendant because of the privacy needs of a deceased party. In *Heemstra*, where the defendant sought a deceased's victim's medical records, we found the defendant had set forth a "bona fide claim of compelling interest sufficient to require a limited disclosure of the privileged information" and noted the defendant might be able to use the evidence to impeach a key prosecution witness. 721 N.W.2d at 559, 563. In doing so, we cited another case finding a defendant's need for treatment records to outweigh a deceased's privacy interest. *Id.* at 562 (citing *United States v. Hansen*, 955 F. Supp. 1225 (D. Mont. 1997)). It would be astounding to me that a party facing life in prison would be deprived of exculpatory evidence in order to protect the privilege of a deceased victim. And, of course, we do not have before us an absolute privilege statute related to domestic abuse or sexual assault victims, which would raise a number of very difficult issues that should not be prejudged in the absence of a case or controversy before us.[7]

---

[7]The case for absolute privilege has been attacked in at least one leading treatise and in the academic literature. *See, e.g.*, Edward J. Imwinkelried, *The New Wigmore: A Treatise on Evidence*, § 5.2.2, at 313–23 (2d ed. 2009) (canvassing empirical studies related to the psychotherapist–patient privilege and concluding that "the available studies . . . do not bear out the assumption that in the mind of the typical patient, the existence of an evidentiary privilege has a major influence either on the decision to consult a professional or on the decision to make revelations to a consulted professional"); Edward J. Imwinkelried, *Questioning the Behavioral Assumption Underlying Wigmorean Absolutism in the Law of Evidentiary Privileges*, 65 U. Pitt. L. Rev. 145, 159–62 (2004) (concluding, after canvassing empirical studies, that "lay respondents were not as concerned about judicially compelled disclosure of confidences that Wigmore hypothesized" and proceeding to review constitutional doctrines that render absolute privileges qualified); Glen Weissenberger, *The Psychotherapist Privilege and the Supreme Court's Misplaced Reliance on State Legislatures*, 49 Hastings L.J. 999, 1004 (1998) (agreeing with Professor Imwinkelried that "the instrumental justification

**C. Application of Proper Standard**. I now turn to the proper application of the standard articulated in my *Neiderbach* opinion. Thompson's main defense was that because of his PTSD, Thompson was unable to form the requisite premeditation to support a conviction of first- or second-degree murder. Thompson had evidence that Gabel treated him very poorly, but he was unable to get this evidence into the record at trial because Thompson declined to take the stand and the defense witnesses did not have personal knowledge of the incidents. Thompson's hearsay evidence indicated Gabel once pointed a gun to his head and pulled the trigger. On another occasion, she apparently held a knife to his throat.

Thompson argues this kind of behavior toward a troubled veteran of the Iraq war with combat experience tended to destabilize the relationship and aggravate his PTSD. Thompson argued the mental health records could demonstrate Gabel had a mean and manipulative personality. Thompson asserted such evidence in the mental health records could convince a jury that Thompson's PTSD was in fact exacerbated by Gabel's conduct on the night of the murder and that, because of the PTSD, he did not have the mens rea necessary to support first- or second-degree murder on the night in question.

The case has some similarities to *Heemstra*. In *Heemstra*, the defendant did not contest that he shot the victim, but instead argued that the victim was a hot head and that he was provoked to shoot him in self-defense. 721 N.W.2d at 552. Unlike in *Heemstra,* Thompson makes no argument that he shot the victim in self-defense. Thompson argues

---

for the psychotherapist privilege is unimpressive" and that "the empirical evidence for the instrumental rationale is weak").

that because Gabel pulled his PTSD triggers on the night in question, he did not form the requisite intent to support a first-degree murder charge. The mental health records could contain objective evidence that, like the victim in *Heemstra*, Gabel had the kind of personality tending to behave in a fashion that could be relevant to Thompson's claim of entitlement to an instruction on voluntary manslaughter.

In *Heemstra*, however, the mental health records tended to impeach a key witness, the deceased's wife, who claimed the decedent had a calm disposition. *Id.* at 563. Here, Thompson does not claim the evidence could be used to impeach a witness, but only that it could be used to establish Gabel was the kind of person who enjoyed aggravating his PTSD symptoms. Thompson attempted to establish this by offering direct evidence of the incidents involving the gun and the knife, but could not do so following the prosecution's hearsay objection. Although the evidence was hearsay, Thompson nonetheless offered hearsay evidence indicating Gabel had a mean and manipulative personality and engaged in activity that would tend to exacerbate his PTSD symptoms.

The State also argues Thompson did not provide the court with any information about the records he sought, but this, of course, is the catch-22 argument. *See Neiderbach*, 837 N.W.2d at 225. Because the records are confidential, Thompson cannot provide the district court with information related to their specific contents. But, all Thompson is required to do is show that the circumstances surrounding Gabel's mental health treatment are sufficient to trigger a reasonably plausible basis to believe there is exculpatory information in the records.

The district court denied the motion on the ground the information about the nature of the relationship between Gabel and Thompson was available from other sources. For the reasons expressed in *Neiderbach*, I

find the district court erred in reaching this conclusion. Medical records are the gold standard of evidence. *See id.* at 228–29. Further, Thompson exercised his constitutional right to not take the stand. There were no other third-party witnesses to their private domestic relationship that Thompson sought to develop. Further, the information sought included the potential observations and diagnosis of a trained professional. I am not convinced that such information was in fact available from other sources.

The problem, however, is that Thompson offered no evidence showing a nexus between the issues at trial and the mental health treatment received by Gabel. He offered virtually no extrinsic evidence regarding the circumstances surrounding Gabel's involuntary hospitalization. When asked why her mother "checked in" to the hospital, Gabel's daughter simply said "because her—my grandma, her mom. Um, they just upset her to the point she thought she needed help, I guess." Thompson did not offer evidence indicating when the hospitalization occurred, or even whether Gabel and Thompson had a relationship at the time. Further, although Thompson told the district court that the defendant's expert indicated that obtaining the records would be "very valuable," Thompson offered no affidavit or other evidence submitted from the expert on this point, but only the arguments of counsel. Because Thompson failed through extrinsic facts to plausibly tie the hospitalization to the issues in this case, I conclude the district court did not err in declining to allow for in camera review of the documents under the standard outlined in my *Neiderbach* special concurrence. I do not concur in any additional discussion of the application of the *Neiderbach* test beyond the above facts, which provide a legally sufficient basis for denying production of the records in this

case. Any further discussion is merely dicta and is not necessary to the outcome of this case.[8]

## II. Conclusion.

For the reasons expressed above, I concur in result only in this case.

Wiggins and Hecht, JJ., join this special concurrence.

---

[8]I further resist any slippery-slope-type argument regarding the application of due process principles to other privileges. As noted long ago in a classic essay, "in virtually every case in which a slippery slope argument is made, the opposing party could with equal formal and linguistic logic also make a slippery slope claim." Frederick Schauer, *Slippery Slopes*, 99 Harv. L. Rev. 361, 381 (1985). Of course, the only issue before the court involves the application of Iowa Code section 622.10(4), as construed by this court, to the facts at hand.