# IN THE COURT OF APPEALS OF IOWA

No. 13-0272
Filed May 29, 2014

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JAMES RANDELL TYSON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Mills County, Mark J. Eveloff (confidential records hearing), Kathleen A. Kilnoski (pretrial motions and first trial), and Richard H. Davidson (pretrial motions and second trial), Judges.

James Randell Tyson appeals from his conviction of second-degree sexual abuse. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Douglas D. Hammerand, and Becky Goettsch, Assistant Attorneys General, and Eric Hansen, County Attorney, for appellee.

Heard by Danilson, C.J., and Potterfield and McDonald, JJ.

**POTTERFIELD, J.**

James Randell Tyson appeals from his conviction of second-degree sexual abuse.[1] He argues the district court erred in failing to conduct an in camera review of the victim's scholastic, therapy, and medical records. He also maintains the court abused its discretion in excluding evidence of the victim's nickname and ADHD medication. Finally, Tyson contends his trial counsel was ineffective in failing to object to inadmissible hearsay. Tyson failed to establish the threshold requirement for an in camera review of the privileged documents. The trial court did not abuse its discretion in its evidentiary rulings. We preserve the claims of ineffective assistance of counsel for possible postconviction proceedings. We affirm the conviction.

## I. Background Facts and Proceedings.

Tyson was charged with lascivious acts with a child and second-degree sexual abuse of nine-year-old D.B. stemming from events occurring on March 13, 2010.

Prior to trial, Tyson filed a motion to produce D.B.'s scholastic, therapy, and medical records.[2] The motion contended that deposition testimony of adult witnesses indicated D.B. had been "rightly or wrongly diagnosed and treated for ADHD" and "treated with V[y]vanse." The motion also asserted Vyvanse is "known to produce side effects that can include delusions and other psychological conditions that are relevant to the alleged victim's credibility and or

---

[1] Tyson's first trial—held in December 2011—ended in a hung jury and a mistrial. This appeal follows the second trial, which began on November 27, 2012.
[2] The motion was filed June 20, 2011; he requested records dating back to 2008.

competency to testify." A hearing was held on the motion, after which the court concluded:

> Iowa Code section 622.10[(4)(a)(2)] [(2011 Supp.)] states that a criminal Defendant seeking access to privileged records must demonstrate in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the Defendant to present a defense in this case.
>
> In this case, the Court cannot find the Defendant has met the initial threshold set out in *Cashen* or Iowa Code section 622.l0[(4)(a)]. Hallucinating or believing things that are not true are just two of over thirty potential side effects [of Vyvanse] set out in Defendant's brief in support of his Motion to Produce. There is no showing in the record that the alleged victim has suffered any of the side effects set out in said document. Particularly, the Court notes there is nothing in the record to show the alleged victim was ever delusional or hallucinating.

At trial, D.B. testified that on March 12, 2010, she was spending the night with her best friend, Ashley. Ashley lived in a house with her mother, sister, and Tyson, but Ashley's mother and sister did not stay there that night. D.B. testified that Tyson asked the girls on Friday night if they knew what the "F" word meant. On Saturday morning, D.B. and Ashley were in the kitchen cooking eggs for themselves. Tyson walked into the kitchen. When D.B. got up from the stool she was sitting on, Tyson grabbed her by the belt loop and took her to the floor. He put his hand inside her pants and inserted his finger in D.B.'s vagina. D.B. told him to stop. When she was able to get up, D.B. told Ashley, "Let's go." The girls went to a nearby park. D.B. attempted to call her mother, Morgia, who did not answer the phone. D.B. called her again and asked if she could stay overnight. D.B. testified she stayed overnight again "because [she] didn't want to leave

Ashley there alone." When the girls returned to Ashley's house, Tyson was gone.

D.B. testified further that Tyson came back later and took the girls for a drive in his truck. The truck had a bench seat; Ashley sat in the middle nearest Tyson, D.B. sat next to the passenger door. During the drive, Ashley sat on Tyson's lap and steered the truck. Ashley told D.B. it was fun and encouraged D.B. to try it. D.B. testified that when she sat on Tyson's lap and steered the truck, he placed one hand on the steering wheel and placed his other hand under her buttocks and rubbed her vaginal region.

Ashley testified she saw Tyson put his hand down D.B.'s pants while they were in the kitchen, though Ashley could not remember if she was sitting in the kitchen or the living room when this occurred. Ashley testified both she and D.B. did sit on Tyson's lap to drive the truck. She did not see Tyson touch D.B. inappropriately in the truck. She also testified she did not want D.B. to tell anyone what at happened, "[b]ecause I didn't want my dog, Buddy, to be t[a]ken away."

Lisa Johnson is a registered nurse, nurse practitioner, and certified pediatric sexual assault nurse examiner at the medical clinic of Project Harmony. Johnson testified, "[W]e do a medical exam for the purpose of assessing, identifying, diagnosing, and treating the children that are seen through Project Harmony Child Advocacy Center."[3] She stated, "The interviews we do are medically directed. The questions I ask the children are questions that will

---

[3] She also testified Project Harmony has a "forensic interview part as well where they're specially trained interviewers that interview the child."

directly affect the medical care that I'm going to provide." Johnson testified she examined D.B. on March 22, 2010. During her examination, D.B. told her "Jim . . . touched her private parts." D.B. stated he touched her "under the clothes" and "in the front two times." Johnson testified the examination found no evidence of trauma and no evidence of scarring.

D.B.'s mother, Morgia, testified that D.B. called her on Saturday March 13 and asked to stay another night with Ashley. On Sunday March 14, D.B. called her to say Ashley's mom was taking Ashley and her half-siblings away; D.B. asked her mother to come get her because she would be there alone. When Morgia picked D.B. up, D.B. stated she never wanted to go back there because Tyson "gave her the creeps." Morgia explained that D.B. did not want to talk to her anymore about the statement until the following day when D.B. stated Tyson had "touched her in her privates." Morgia called police and Ashley's mother. Morgia testified she brought Ashley and her half-sister to Morgia's house and they ended up staying with Morgia for a while; Ashley was upset with D.B. for telling. When Tyson was arrested, Ashley's half-sister went to live with her father, Tyson's dog Ashley cared about was taken away, and Ashley moved.

Noopur (Suzie) Mistry, a child interview specialist at Project Harmony also testified she interviewed D.B. prior to the physical examination. Mistry testified she was a "forensic interviewer" and she talked to children whenever there was an allegation of abuse "to get a good accurate account of what was going on." Mistry described D.B.'s statements during the interview. D.B. told Mistry that Tyson "put his hand inside her underwear pants and touched her directly on her skin of her private part." D.B. said this happened once at lunchtime and once in

the truck. Employing a doll, D.B. indicated the "private part" was the vaginal area.

Tyson testified. He explained that it was the girls who were using the "F" word, chanting a line from a movie. He stated that he asked them, "Do you know what that word means?" He testified D.B. "knew quite a lot. She was very well versed." Tyson testified he drove with D.B. and Ashley on Saturday to get food at a fast food restaurant. He denied touching D.B. inappropriately.

The jury convicted Tyson of the second-degree sexual abuse charge (related to his placing his finger in D.B.'s vagina while they were in the kitchen). The jury found Tyson not guilty of lascivious acts with a child (in connection with the charge related to the alleged assault while in the truck).

On appeal, Tyson contends the district court erred in failing to conduct an in camera review of D.B.'s scholastic, therapy, and medical records. He also asserts the court abused its discretion in excluding evidence of D.B.'s medication and nickname. Finally, he argued trial counsel was ineffective in failing to object to hearsay testimony by Mistry and in eliciting hearsay testimony by Kimberly Clark.

## II. Scope and Standard of Review.

Discovery rulings challenged on constitutional grounds are reviewed de novo. *State v. Thompson*, 836 N.W.2d 470, 476 (Iowa 2013); *State v. Cashen*, 789 N.W.2d 400, 405 (Iowa 2010) ("Because the issues in this case rest on constitutional claims involving Cashen's due process right to present a defense, our review is de novo."). Nonconstitutional challenges to discovery rulings and evidentiary rulings are reviewed for an abuse of discretion. *Thompson*, 836

N.W.2d at 476 (discovery); *In re Det. of Blaise*, 830 N.W.2d 310, 315 (Iowa 2013) (evidentiary). We review claims of ineffective assistance of counsel de novo. *Blaise*, 830 N.W.2d at 315.

**III. Analysis.**

*A. Tyson has not made a threshold showing entitling him to an in camera review.* "[A] criminal defendant has a due process right to present evidence to a jury that might influence the jury's determination of guilty." *Cashen*, 789 N.W.2d at 407. However, "a defendant is not entitled to engage in a fishing expedition when seeking a victim's mental health records." *Id.* at 408.

In *Cashen*, our supreme court recognized patients have a qualified, rather than an absolute, "constitutional right to privacy in their medical records." *Id.* at 406. The court also recognized "a criminal defendant has a due process right to present evidence to a jury that might influence the jury's determination of guilt." *Id.* at 407. The court adopted a protocol it determined appropriately balanced the defendant's rights with the victim's. *Id.* at 408-10. If the defendant could demonstrate "some good faith factual basis indicating how the records are relevant to the defendant's innocence," the district court was to hold a hearing "to determine if a reasonable probability exists that the records contain exculpatory evidence tending to create a reasonable doubt as the defendant's guilt"; if so, the court would "issue a subpoena for the records to be produced under seal to the court." *Id.* at 408.

In response to the *Cashen* opinion, our legislature amended Iowa Code section 622.10. *See Thompson*, 836 N.W.2d at 481. Section 622.10(4)(b) now provides that "privileged information obtained by any means other than as

provided in paragraph 'a' shall not be admissible in any criminal action."

Paragraph "a" reads as follows:

> Except as otherwise provided in this subsection, the confidentiality privilege under this section shall be absolute with regard to a criminal action and this section shall not be construed to authorize or require the disclosure of any privileged records to a defendant in a criminal action unless either of the following occur:
>
> (1) The privilege holder voluntarily waives the confidentiality privilege.
>
> (2)(a) The defendant seeking access to privileged records under this section files a motion demonstrating in *good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case*. Such a motion shall be filed not later than forty days after arraignment under seal of the court. Failure of the defendant to timely file such a motion constitutes a waiver of the right to seek access to privileged records under this section, but the court, for good cause shown, may grant relief from such waiver.
>
> (b) Upon a showing of a reasonable probability that the privileged records sought may likely contain exculpatory information that is not available from any other source, the court shall conduct an in camera review of such records to determine whether exculpatory information is contained in such records.
>
> (c) If exculpatory information is contained in such records, the court shall balance the need to disclose such information against the privacy interest of the privilege holder.
>
> (d) Upon the court's determination, in writing, that the privileged information sought is exculpatory and that there is a compelling need for such information that outweighs the privacy interests of the privilege holder, the court shall issue an order allowing the disclosure of only those portions of the records that contain the exculpatory information. The court's order shall also prohibit any further dissemination of the information to any person, other than the defendant, the defendant's attorney, and the prosecutor, unless otherwise authorized by the court.

Iowa Code § 622.10(4)(a) (emphasis added). Our supreme court in *Thompson*, 836 N.W.2d at 482, observed "the statute requires a stronger threshold showing

to obtain mental health records for an in camera inspection" than enunciated in *Cashen*.[4]

Tyson argues the district court erred in not conducting an in camera review of D.B.'s scholastic, therapy, and medical records. On our de novo review, we must determine whether Tyson has established "a reasonable probability that the information sought is likely to contain exculpatory information . . . for which there is a compelling need for the defendant to present a defense in the case." Iowa Code § 622.10(4)(a)(2)(a). The term "reasonable probability" means "a substantial, not just conceivable, likelihood." *Thompson*, 836 N.W.2d at 484 (citations and internal quotation marks omitted). And the term "likely" means "probable or reasonably to be expected." *Id.* (citations and internal quotation marks omitted).

Tyson argues he was entitled to have the district court conduct an in camera review of D.B.'s records for exculpatory evidence because, during her deposition, Morgia noted D.B. was experiencing behavioral problems in first or second grade, which led to a diagnosis—or misdiagnosis—of attention deficit hyperactivity disorder (ADHD), which then led to D.B. being prescribed a drug for ADHD, Vyvanse.[5] Tyson urges some of the possible side effects of the drug are hallucinations and delusions, which, if D.B. experienced the side effects, would affect her credibility. We are not persuaded this is sufficient to establish a substantial likelihood that the privileged records contain exculpatory evidence. *See*, *e.g.*, *State v. Neiderbach*, 837 N.W.2d 180, 196-97 (Iowa 2013) (finding

---

[4] The *Thompson* court found the provision facially constitutional. 836 N.W.2d at 485.
[5] A brand name of lisdexamfetamine "used as part of a treatment program to control symptoms of attention deficit hyperactivity disorder".

court erred in not conducting an in-camera inspection where defendant's trial strategy included raising reasonable doubt whether certain injuries were caused by the co-defendant, and co-defendant displayed strange behavior following arrest and subsequently pled guilty to child endangerment).

Tyson argues D.B. was misdiagnosed with ADHD and thus the prescription for Vyvanse was unwarranted. In her deposition—upon which Tyson relies—Morgia stated D.B. was diagnosed with ADHD by a doctor after a teacher encouraged Morgia to seek medical assistance. Morgia, however, stated she believed D.B. had "hereditary anxiety, which I have," but not ADHD. Morgia stated that D.B. lost weight while taking the drug prescribed for ADHD. Morgia also stated that when D.B.'s dosage was reduced (after the incidents at issue), D.B. "started getting angry." Nothing in D.B.'s mother's testimony suggests D.B. experienced side effects that might have affected her perception or credibility. We conclude Tyson's claim that a *possible* side effect of a drug D.B. was prescribed *may have affected* D.B.'s credibility does not meet the threshold requirement of a "reasonable probability that the information sought is likely to contain exculpatory information." We find no error in the trial court's refusal to conduct an in camera review of D.B.'s scholastic, therapy, and medical records.

*B. The trial court did not abuse its discretion in excluding evidence of D.B.'s medication and her nickname.* The State moved in limine to exclude any evidence of D.B.'s medication and to exclude the use of D.B.'s nickname, "Devil Child." The trial court concluded the mother's statements as to D.B.'s diagnosis were inadmissible hearsay. The court ruled, "Defendant has not shown any

evidence that the child's diagnosis, misdiagnosis, or medication affected her perception or credibility" and excluded such evidence.

With respect to the child's nickname, the court determined the prejudicial effect outweighed any probative value.

> The Court is unaware of the origin of the name and its true meaning, and as such, it may be misinterpreted by a reasonable juror or certainly, confusing.
> Obviously, the defendant is free to make inquiry through the State's witnesses or their own concerning the child's behavior or demeanor, and the Court has discussed with counsel in previous off the record discussions, I'm not clear whether this nickname was given to the child because she was a rambunctious two-year-old or an—some hateful nine-year-old or something in the middle. And different family members may have a different connotation to the nickname. And for all those reasons, I think it would be confusing and certainly prejudicial.

Tyson challenges these rulings.

Rulings on the admissibility of hearsay evidence are reviewed for correction of errors at law. *State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003). We review evidentiary rulings for an abuse of discretion. *State v. Huston*, 825 N.W.2d 531, 536 (Iowa 2013). "Under this standard, we reverse only if the district court exercised its discretion on clearly untenable or unreasonable grounds." *In re Det. of Stenzel*, 827 N.W.2d 690, 697 (Iowa 2013).

*1. ADHD Medication.* On appeal, Tyson argues the trial court abused its discretion in disallowing evidence of D.B.'s use of medication. He argues "the fact that D.B. was on medication at the time of the alleged offense is relevant to D.B.'s credibility" and a "party is entitled to try to impeach a witness's credibility as it is reflected in her ability to observe, remember, or recount."

Just prior to trial, defense counsel made the following "offer of proof":

If called to testify, Jim Tyson would testify that on Saturday morning, the mother's paramour, live-in boyfriend, whatever you call him, came to the house about 8 o'clock with [D.B.'s] medication, that is the Vyvanse, the amphetamines, that he brought two tablets of those amphetamines with her—with him that day about 8 o'clock in the morning and that he has personal knowledge that the child took both capsules Saturday morning, which is the day in question. So that would be not only an abuse of the pharmaceutical, of a prescription, but would imply that the child was abusing these amphetamine drugs. And to corroborate that, you take the competent testimony, but they stayed up all night Friday night, they stayed up and stayed up 2 until 3 the following night, which is in my opinion, at least an inference that she was on this amphetamine. We don't know if it's a pediatric dose. We don't know an adult dose. We don't know how many of these things she's ingested over a period of time.

The district court concluded,

even if there is some relevance to this, what it serves to do is confuse the fact finders, and that, I think, ultimately is the issue.

And I don't want to rehash the *Cashen* hearings all over again, but that's one of the biggest problems is that all it does is create perhaps a[n in]ference and nothing more that under [Iowa Rule of Evidence 5.403] this Court finds it's just not probative when balanced against the prejudicial.

Iowa Rule of Evidence 5.403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tyson claims he was entitled to ask D.B. about her "drug use," because "*if* D.B. was taking a prescribed medication which was unnecessary, the effect of the drug *may* compromise her perception or memory." The trial court's determination—that allowing evidence D.B. was on ADHD medication would confuse the issues and was more prejudicial than probative—is not clearly unreasonable. Tyson's offer of proof involved his proposed testimony

that he observed D.B. take two pills on the Saturday morning the events occurred. The proposed testimony did not include—since Tyson did not know—the kind of medication or its purpose, and was inadequate to resolve the confusion and speculation that would have resulted from the information about the pills. We conclude the trial court acted within its discretion in rejecting Tyson's tenuous argument for relevancy and admissibility of the ADHD medication.

In any event, defense counsel was able to cross-examine D.B. to test her memory and perceptions. Morgia and Ashley, too, were cross-examined at length. Defense counsel also questioned Noopur Mistry about whether a child's mental health issues, including ADHD, affected her findings. Under the circumstances presented, we find no abuse of the trial court's discretion.

*2. Nickname.* Tyson contends he should have been allowed to present evidence that D.B.'s nickname was Devil Child because it showed "how she was perceived by her family and friends." Again, we find no abuse of the trial court's discretion in its ruling that the nickname was more prejudicial than probative. Contrary to Tyson's claim that exclusion of the evidence foreclosed any attempt to show D.B.'s behavior, the district court quite clearly observed, "Obviously, the defendant is free to make inquiry through the State's witnesses or their own concerning the child's behavior or demeanor." The inability to refer to D.B. as Devil Child was not an abuse of discretion. *Cf. United States v. Yuot*, CR 07-4091-MWB, 2008 WL 2857144, at *5 (N.D. Iowa July 23, 2008) (discussing Eighth Circuit Court of Appeals cases dealing with use of an alias and quoting *United States v. Delpit*, 94 F.3d 1134, 1146 (8th Cir.1996) ("In some cases, the

use of a defendant's irrelevant nickname to suggest his bad character or unsavory proclivities may be prejudicial.")).

*C. Ineffective-assistance-of-counsel claims preserved for possible postconviction proceedings.* Tyson maintains his trial counsel was ineffective in failing to object to hearsay testimony from Mistry, the child interview specialist at Project Harmony, and in eliciting hearsay testimony from Kimberly Clark, a sergeant at the Mills County Sheriff's Office.

A defendant claiming ineffective assistance of counsel must show both that his trial counsel breached an essential duty and prejudice resulted. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "Unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." *State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012) (internal quotation marks and corrections omitted).

We ordinarily preserve such claims for possible postconviction relief proceedings. *State v. Biddle*, 652 N.W.2d 191, 203 (Iowa 2002). "That is particularly true where the challenged actions of counsel implicate trial tactics or strategy which might be explained in a record fully developed to address those issues." *State v. Rubino*, 602 N.W.2d 558, 563 (Iowa 1999).

*1. Failure to object to Mistry's testimony.* Tyson argues Mistry's testimony regarding D.B.'s statements was not admissible because those statements were not made for purposes of medical diagnosis or treatment. The State argues Mistry's testimony as to D.B.'s statements were admissible under principles enunciated in *State v. Hildreth*, 582 N.W.2d 167, 169-70 (Iowa 1998)

(concluding statements made by child sex abuse victim to experienced and specially trained social workers qualified as statements made for the purpose of diagnosis and treatment, which are admissible under rule of evidence 5.803(4)). Statements made for purposes of diagnosis and treatment are admissible

> if they fit within the two-part test this court has adopted. The two-part test requires the proponent of the statement to show: (1) the declarant's motive in making the statement is consistent with the purposes of promoting treatment, and (2) the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis.

*State v. Hanes*, 790 N.W.2d 545, 553 (Iowa 2010) (citing *Hildreth*, 582 N.W.2d at 169-70). Mistry is a forensic examiner. She testified she had specialized training in interviewing children referred to Project Harmony because there has been an allegation the child has been subject to abuse or had witnessed a crime. Because D.B.'s statements to Mistry do not clearly qualify under the two-part test noted in *Hanes*, defense counsel will be afforded an opportunity to explain why no objection was made to this testimony.

*2. Eliciting testimony from Clark.* Tyson's trial counsel called Kimberly Clark as a witness. Clark then testified about statements made by D.B.

We preserve the issue of trial counsel's competence with respect to his failure to object to Mistry's testimony and his questioning of Clark for possible postconviction proceedings. *See Clay*, 824 N.W.2d at 500 ("In regards to Clay's claim that his counsel was ineffective for failing to object to these out-of-court statements, the first prong of the *Strickland* test requires us to decide if trial counsel failed to perform an essential duty by not objecting. If the challenged actions of counsel implicate trial tactics or strategy, we will not address the issue

until the record is fully developed."); *State v. Ondayog*, 722 N.W.2d 778, 786 (Iowa 2006) ("Because '[i]mprovident trial strategy, miscalculated tactics, and mistakes in judgment do not necessarily amount to ineffective assistance of counsel,' *State v. McKettrick,* 480 N.W.2d 52, 55 (Iowa 1992), postconviction proceedings are often necessary to discern the difference between improvident trial strategy and ineffective assistance.").

## IV. Conclusion.

Tyson failed to establish the threshold requirement for an in camera review of the privileged documents. The trial court did not abuse its discretion in its evidentiary rulings. We preserve the claims of ineffective assistance of counsel for possible postconviction proceedings. We therefore affirm the conviction.

**AFFIRMED.**