# IN THE SUPREME COURT OF IOWA

No. 57 / 18–1947

Filed January 24, 2020

**STATE OF IOWA,**

Appellee,

vs.

**RICHARD WAYNE LEEDOM,**

Appellant.

---

Appeal from the Iowa District Court for Poweshiek County, Shawn R. Showers (trial) and Crystal S. Cronk (discovery), Judges.

Defendant convicted of sexually abusing his granddaughter appeals order denying his motion for a new trial and pretrial ruling denying his motion for an in camera review of the victim's mental health records. **DISTRICT COURT JUDGMENT CONDITIONALLY AFFIRMED; CASE REMANDED WITH INSTRUCTIONS.**

Robert P. Montgomery and Brandon Brown of Parrish Kruidenier Dunn Gribble Gentry Brown & Bergmann, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Darrel Mullins, Susan Krisko, and Thomas J. Ogden, Assistant Attorneys General, for appellee.

**WATERMAN, Justice.**

In this appeal, we must decide whether the district court erred by denying the defendant's motion for an in camera review of the victim's mental health records, among other issues. The defendant was charged with sexually abusing his granddaughter, and her credibility was a key fighting issue. Her parents were in a bitter child custody modification proceeding, and the granddaughter strongly preferred to live with her father. To improve her father's custody claim, she admittedly lied about a car accident he caused that put her at risk. She also told an investigator that her mother physically abused her and did nothing when told of the maternal grandfather's sexual abuse. The granddaughter testified in her deposition that she had disclosed the defendant's abuse to her therapist, a mandatory reporter. The defendant, noting that the therapist had not reported the alleged abuse, argued the records likely contained exculpatory impeachment evidence and filed a motion pursuant to Iowa Code section 622.10(4) (2018) for the court's in camera inspection. The district court twice denied the motion and the defendant's request for an ex parte hearing. The case proceeded to a jury trial in which the defendant was convicted on all counts. The defendant appealed raising multiple grounds for a new trial. We retained the case.

For the reasons explained below, we hold the district court properly denied the defendant's motion for an ex parte hearing but erred by failing to conduct an in camera inspection of the victim's mental health records. We determine the defendant's other grounds for a new trial lack merit. Accordingly, we conditionally affirm his convictions, but we remand the case for the in camera inspection consistent with this opinion.

## I. Background Facts and Proceedings.

On April 29, 2016, a fourteen-year-old girl, H.M., disclosed to an investigator for the Iowa Department of Human Services (DHS) that she had been sexually abused by her maternal grandfather, Richard Wayne Leedom, who she refers to as "Papa." At that time, the DHS was investigating H.M.'s claims that her mother, Teah Leedom, had choked her and called her derogatory terms. H.M.'s parents were engaged in a contested child custody modification proceeding, and H.M. strongly preferred to spend more time with her father. H.M. told the DHS investigator that "one of the reasons [H.M.] was so upset with [Teah] was that when [she] told [Teah] what Papa had done, [Teah] didn't do anything about it." H.M. reported three instances of sexual abuse, all of which occurred at Leedom's home in Lake Ponderosa where H.M. and her older brother often spent the night.

The first two instances happened when H.M. was about nine or ten years old. While H.M was sleeping in Leedom's bed with him, she awakened with her pajamas unzipped and Leedom's finger running from her vagina to the small of her back. H.M. left the bed for the bathroom. When she returned, Leedom kept calling her "Susan," the name of his then-girlfriend, later wife. When H.M. told Teah, she was told it would stop, but it happened again.

The second time occurred while H.M. slept on the outside of the bed, with Leedom in the middle, and Susan on his other side against the wall. Leedom touched H.M.'s vagina while she faced him. H.M. again left for the bathroom afterwards, then went to sleep in a different room on the couch. Leedom came out and asked H.M. if she was okay with what had happened before returning to his room. H.M. did not tell Teah or Susan at that time.

The third instance occurred when H.M. was eleven or twelve years old. This time, H.M. refused to sleep in Leedom's bed, but he told her there was no room in the living room for her to sleep, so she laid on a cushion on the bedroom floor next to his bed. When Leedom kneeled next to the bed to pray, he reached over and rubbed and squeezed H.M.'s buttocks over her clothes. She moved, and Leedom jumped and stopped touching her. A few days later, H.M. wrote about what had happened the second and third times on the "Notes" app in her iPad and showed Teah. No investigation began at that time.

This criminal case arose out of the DHS investigation commenced in 2016. On August 2 of that year, Leedom was charged with three counts of second-degree sexual abuse in violation of Iowa Code sections 709.1 and 709.3(1)(*b*) and one count of indecent contact with a child in violation of section 709.12(1)(*b*). On July 17, 2017, one count of second-degree sexual abuse was dropped.

H.M. was deposed on November 8, 2017. During her deposition, H.M. testified that she told her therapist, Jessica Schmidt, about the sexual abuse in approximately August 2015. H.M. claimed she told Schmidt that she had already informed someone else so Schmidt did not need to report it. Specifically, H.M. stated,

I did tell Jessica. I forgot to mention that.

. . . .

Q. Had you yet at that time shared with Jessica, your therapist, anything about your accusations against your Grandpa Rick? A. I think so.

. . . .

Q. Did you get a promise from Jessica not to reveal that to anyone also? A. Well, I kind of told her that I had already told somebody so she wouldn't tell.

Q. Excuse me? A. I told her that I had told somebody because I didn't want her to tell because people don't really

understand it. It's not just somebody out on the street that did this to me, it's somebody that I actually care about and somebody that I don't want to see suffer.

. . . .

Q. And did your therapist tell you she could agree not to share it with anyone? A. I mean she said if it was being taken care of, then she didn't have to get into it.

Q. Well, did you tell the therapist the truth that you had shared it with somebody or is that a lie you had shared it with somebody? A. I had told my mom, but I didn't tell, like, DHS or anybody.

Q. Do you specifically remember telling Jessica? A. Yeah.

Q. You do? A. I remember telling her, yeah.

. . . .

Q. Did Jessica ask you who you had shared it with? A. No.

On January 4, 2018, Leedom filed a motion to release privileged records, specifically those of Schmidt, and requested the court's in camera review of those records. Leedom argued that there was a reasonable probability that the records contained exculpatory information. His theory was that as H.M.'s therapist, Schmidt was a mandatory reporter yet no report had been made to the authorities, raising an inference that the records would rebut H.M.'s testimony that she had disclosed the allegations to Schmidt. Alternatively, if H.M. had reported the abuse, inconsistencies in her versions of what happened could help defense counsel impeach her at trial.

At a hearing on the motion, Dr. Veronica Lestina, a clinical psychologist and licensed mental health counselor, was called by the State to testify in support of its resistance to the motion. Dr. Lestina testified that she would be required to report if a patient twelve years old or younger told her about sexual abuse, but it turns into a "may report it" situation for a child over twelve. As the State argued, "The important portion of

[Dr. Lestina's testimony] is that a review of [H.M.'s therapist records] is not going to be conclusive on the issue of whether or not she did or did not disclose." Defense counsel pointed out that Dr. Lestina testified that she would still report in a situation with a child a few years older than twelve and the conversation with the child would be in her records.

On April 3, the district court issued a ruling denying the motion, concluding that Leedom had not showed a compelling need outweighing H.M.'s right to confidentiality. Leedom subsequently filed a motion to reconsider, asserting a need for an in camera review of H.M.'s records and requesting an ex parte hearing to educate the court on the need to review the records without revealing his defense strategy to the State. Leedom also filed an offer of proof to support the request for the confidential records.

On May 7, 2018, Schmidt testified during a hearing on this motion. She confirmed that she is a mandatory reporter.

> [MR. MONTGOMERY:] As a licensed mental health counselor in Iowa, are you a general mandatory reporter? A. Yes.
>
> . . . .
>
> Q. So there are more mandatory reporting obligations with juveniles or children than with adults, correct? A. There's mandatory reporting for children and dependent adults.
>
> . . . .
>
> Q. For children, who do you consider a child under the law? A. Anyone under the age of 18.
>
> . . . .
>
> Q. And have you had some mandatory reports, reports of sexual abuse that were conveyed to you by a patient during a therapy session? . . . A. Yes. As a mandatory reporter, we report if someone disclosed alleged sexual abuse.

Additionally, Schmidt stated that she documents every session.

Q. So without regard to any particular individual or any substance, is there a protocol for note-taking with clients who are children under the age of 18? A. We document -- we have to document after every session, we write a progress note.

Q. And does the protocol include, without regard to any identity or any substance, documenting specifically -- protocol specifically involve documenting any reports of sexual abuse? A. We document what's shared in the session, and then if we make a report, we report that to the State.

Schmidt elaborated on what she considered as an incident subject to mandatory reporting.

[MR. MONTGOMERY:] If someone under the age of 18 reports to you in a therapy session that they have been sexually abused, is that a mandatory reporting incident? [The Court permitted the witness to answer after objections and a voir dire examination.] A. Yes.

MR. MONTGOMERY[:] And by answering yes, does that mean you would have to, regardless of identity of the individual, regardless of any particulars, does that mean you would have to relay that information on to law enforcement or governmental authorities? A. To my knowledge it would depend on if there was already an established investigation going on or if they were told that maybe it had already been investigated and taken care of. So it just kind of depends on what is happening in that session at that moment.

Q. Okay. If you haven't been informed of any of that, what would the mandatory requirement trigger? A. If I had no knowledge, I would have to report it.

More specifically,

Q. You have a therapy client who's 17 or under who has reported to you sexual abuse, you're not aware of any ongoing governmental or law enforcement investigation relative to that report of sexual abuse, would you under any circumstances engage in an agreement, pact or understanding to, nonetheless, not mandatorily report that? A. We don't make pacts in counseling.

Q. So that is a, no, you wouldn't do anything like that or you would? A. I wouldn't, no.

Schmidt concluded by stating that she shares any report of sexual abuse by minor clients with DHS without a waiver, written or otherwise. The district court denied the motion to reconsider.

During the jury trial, Leedom's defense strategy was that H.M. had fabricated the allegations against him to improve her chances of living with her father, Rodney Morse, who was more permissive than Teah. Prior to the DHS disclosure, H.M. lived with Teah but spent certain days and weekends with her father. H.M. openly expressed her desire to live with Rodney over Teah, even pressuring a school counselor to contact DHS to relay her desire. H.M.'s motivation and credibility were at issue.

H.M., who was sixteen at the time of the trial, testified about the details of the sexual abuse and the conflict with her mom. Defense counsel cross-examined H.M. at trial about how she had lied to improve her father's position in the custody modification so she could spend more time with him.

Specifically, H.M. had given inconsistent accounts of a rollover accident that occurred in February 2016, when Rodney was driving with H.M as his passenger. Rodney's fitness as a parent was at issue in the custody-modification proceeding. In H.M's deposition, she initially minimized the accident but then changed her testimony after a break in the deposition. At first, H.M. stated that they just went on a drive to her grandmother's house and that the vehicle landed on its side. She also expressed her belief that her mom was the one who called DHS and said that Rodney had been drinking, which made her angry with Teah. After returning from a break where H.M. appeared to talk to her father in the hallway, she admitted that they were actually chasing deer in a field at the time of the accident. Additionally, she later confessed that the car actually had flipped over completely to rest on its top, upside down. H.M. also admitted in her deposition that she lied to a DHS investigator about the accident.

H.M.'s friend, B.G., also testified about the rollover accident. B.G. testified that she and another friend had initially been in the vehicle, countering H.M.'s account that it had just been her and her dad. B.G. stated that H.M. brought beer to the vehicle, and Rodney was drinking and driving, which scared her and the other friend so she asked that he drop them off. He did, but H.M. stayed in the vehicle with him. B.G. stated after the accident H.M. told her to lie to DHS, which she took to mean that she should lie about Rodney's drinking that evening. Later, when called again as a surrebuttal witness, she elaborated,

> Q. What did you convey to [DHS investigator] Meagan See, say to her there that day in the interview, that [H.M] told you to do in your approach to the DHS if they came to you calling and asking questions? A. She told me that if DHS talked to me, to lie straight through my teeth.

B.G. also stated that Rodney's rules were loose, and "[h]e didn't really care what [H.M.] did." B.G. also testified that H.M. had told her about Leedom abusing her.

Terri Leedom, H.M.'s maternal grandmother, testified about Leedom's home and the family dynamics. Colleen Brazil, a forensic interview program manager for Project Harmony in Omaha, Nebraska, testified at trial as the State's expert witness. Brazil testified about misconceptions about child sexual abuse, reasons for delayed disclosure of abuse, information about grooming processes, and how children often lack the capacity to describe when or how often such abuse occurred. Meagan See, a child protection worker with DHS, testified about the investigations into the rollover accident and Teah's abuse of H.M.

The jury returned a verdict on June 29. Leedom was found guilty of both counts of second-degree sexual abuse and the count of indecent contact with a child in violation of Iowa Code chapter 709. He moved for

a new trial based on prosecutorial misconduct and violations of the in-limine ruling regarding the scope of Brazil's testimony. That motion was denied, and Leedom was sentenced on October 15 to twenty-five years imprisonment for each count of sexual abuse in the second degree and two years for the indecent exposure charge, to run concurrently.

Leedom appealed his conviction, arguing the district court violated his statutory and constitutional due process rights to an in camera review of H.M.'s mental health records for exculpatory evidence and erred in denying his right to an ex parte hearing on that issue. He further argued the court erred by denying his motion for a new trial based on prosecutorial misconduct, improper jury selection, violations of the motion in limine as to Brazil's vouching for H.M.'s credibility, and denial of defense expert testimony. We retained the appeal.

## II. Standard of Review.

"Discovery rulings challenged on constitutional grounds are reviewed de novo." *State v. Thompson*, 836 N.W.2d 470, 476 (Iowa 2013). "Nonconstitutional challenges to discovery rulings are reviewed for abuse of discretion." *Id.* Our review of a claim of a violation of the constitutional right to present a defense, a Due Process Clause challenge, is de novo. *State v. Clark*, 814 N.W.2d 551, 560 (Iowa 2012). We review rulings on claims of prosecutorial misconduct for abuse of discretion. *State v. Coleman*, 907 N.W.2d 124, 134 (Iowa 2018). We review de novo Leedom's constitutional claim that his right to compulsory process was violated. *State v. Heard*, 934 N.W.2d 433, 439 (Iowa 2019). A district court's decision to excuse potential jurors is reviewed for abuse of discretion. *State v. Hobson*, 284 N.W.2d 239, 241 (Iowa 1979).

### III. Analysis.

We retained this case primarily to review the district court's denial of Leedom's motion for an in camera inspection of H.M.'s mental health records. We conclude Leedom met the statutory requirements to trigger the district court's obligation to inspect the records of H.M.'s treating therapist, Jessica Schmidt. We reverse the district court's rulings denying that in camera inspection and remand the case for the district court to conduct that inspection pursuant to Iowa Code section 622.10(4)(*a*)(2).

We then address Leedom's other grounds for a new trial below and conclude they lack merit. We therefore conditionally affirm his convictions subject to the outcome of the in camera inspection.

**A. H.M.'s Mental Health Records.** Iowa Code section 622.10 governs access to mental health records and generally prohibits disclosure of confidential communications between mental health professionals and their patients. Iowa Code § 622.10(1). The legislature added subsection 622.10(4)(*a*)(2) in 2011, in response to our decision in *State v. Cashen*, 789 N.W.2d 400, 408–10 (Iowa 2010), allowing greater access by criminal defendants to victims' mental health records. *See* 2011 Iowa Acts ch. 8, § 2 (amending Iowa Code § 622.10 (Supp. 2011)); *Thompson*, 836 N.W.2d at 481 (noting the legislature's response to *Cashen*). Justice Cady had dissented in *Cashen*, noting the majority's new protocol "adopt[ed] one of the weakest tests known to the law" for allowing an accused abuser's defense counsel access to a victim's confidential therapy records. 789 N.W.2d at 411 (Cady, J., dissenting). Justice Cady warned that the new *Cashen* test may "ultimately cause victims to decline to report domestic abuse in order to [avoid] being required to disclose very personal and private information to the alleged abusers." *See id.* The legislature responded the next session with a statutory protocol that substituted

in camera review by the district court for the more intrusive review by the accused abuser's attorney. *See Thompson*, 836 N.W.2d at 482–83.

We held "that section 622.10(4) is constitutional on its face and supersedes the *Cashen* protocol." *Id.* at 490. The amended statute "restores protection for the confidentiality of counseling records while also protecting the due process rights of defendants." *Id.* at 481. Leedom and the State agree that the statute governs, but they disagree whether the requisite showing was made in this case to trigger the district court's in camera review.

We begin with the text of section 622.10.

> 4. *a.* Except as otherwise provided in this subsection, the confidentiality privilege under this section shall be absolute with regard to a criminal action and this section shall not be construed to authorize or require the disclosure of any privileged records to a defendant in a criminal action unless either of the following occur:
>
> (1) The privilege holder voluntarily waives the confidentiality privilege.
>
> (2) (a) The defendant seeking access to privileged records under this section files a motion demonstrating in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case. Such a motion shall be filed not later than forty days after arraignment under seal of the court. Failure of the defendant to timely file such a motion constitutes a waiver of the right to seek access to privileged records under this section, but the court, for good cause shown, may grant relief from such waiver.
>
> (b) *Upon a showing of a reasonable probability that the privileged records sought may likely contain exculpatory information that is not available from any other source, the court shall conduct an in camera review of such records to determine whether exculpatory information is contained in such records.*
>
> (c) If exculpatory information is contained in such records, the court shall balance the need to disclose such information against the privacy interest of the privilege holder.

> (d) Upon the court's determination, in writing, that the privileged information sought is exculpatory and that there is a compelling need for such information that outweighs the privacy interests of the privilege holder, the court shall issue an order allowing the disclosure of only those portions of the records that contain the exculpatory information. The court's order shall also prohibit any further dissemination of the information to any person, other than the defendant, the defendant's attorney, and the prosecutor, unless otherwise authorized by the court.

Iowa Code § 622.10(4) (2018) (emphasis added). The district court ruled Leedom failed to meet the showing required under section 622.10(4)(2)(*b*). We disagree.

We first address a threshold issue, whether the district court erred in denying Leedom's request for an ex parte hearing on the motion for an in camera review to explain his reasons for seeking H.M.'s mental health records without disclosing the trial strategy to the State. Leedom relies on *State v. Dahl,* in which the state resisted an indigent defendant's application under Iowa Code section 815.7 for funds to hire an investigator. 874 N.W.2d 348, 350 (Iowa 2016). We allowed the defendant an ex parte hearing to avoid disclosing his defense strategy to the prosecution. *Id.* at 352–53. *Dahl* is inapposite. The State's role under Iowa Code section 815.7 is simply to protect the public fisc; by contrast, section 622.10(4)(*a*) protects sensitive confidential mental health information of third parties and has no provision for an ex parte hearing. The State should be heard to safeguard the victim's privacy rights. *See Thompson,* 836 N.W.2d at 489 ("Here, our legislature has recognized a similar compelling interest in protecting the psychological and emotional needs of crime victims by limiting the disclosure of their mental health records."). The district court properly denied Leedom's request for an ex parte hearing on his section 622.10(4) motion.

Turning to the merits of Leedom's motion, in our view, the district court abused its discretion by failing to conduct an in camera review of the Schmidt therapy records for exculpatory information. The State lacked corroborating physical evidence of sexual abuse, and its case hinged on H.M.'s credibility. She admittedly lied about her father's rollover accident in an effort to secure placement with her father. Leedom contends H.M. falsely reported sexual abuse by the maternal grandfather for the same reason—so that she could live with her father. H.M. testified she reported Leedom's abuse to her therapist Schmidt. Yet Schmidt, a mandatory reporter who would note any abuse in her records, did not report the allegations to the DHS. Leedom argues the district court should have reviewed Schmidt's records because the absence of any mention of abuse by Leedom would be exculpatory as evidence it never happened and would also serve as impeachment evidence against H.M. We agree with Leedom that a sufficient showing was made to require the district court's in camera review. This was a targeted inquiry rather than a fishing expedition.

The legislature did not define the term "exculpatory" in section 622.10, so we give that term its ordinary meaning: Exculpatory evidence tends to "establish a criminal defendant's innocence." *Exculpatory Evidence, Black's Law Dictionary* (11th ed. 2019). The parties disagree whether evidence offered solely to impeach a witness is exculpatory. Leedom argues that impeachment evidence is necessarily exculpatory. The State cautions that broadly defining "exculpatory" to include anything that impeaches the credibility of a witness would undermine the confidentiality of mental health records the legislature sought to protect after *Cashen.* We note that in the analogous context of *Brady* disclosures required for evidence favorable to the defendant and material to guilt or

innocence,[1] the United States Supreme Court "has rejected any such distinction between impeachment evidence and exculpatory evidence." *United States v. Bagley,* 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985). We too have recognized that "[impeachment] evidence . . . , if disclosed and used effectively, . . . may make the difference between conviction and acquittal." *DeSimone v. State,* 803 N.W.2d 97, 105 (Iowa 2011) (quoting *Bagley,* 473 U.S. at 676, 105 S. Ct. at 3380). In *DeSimone,* we vacated a conviction for sexual assault and ordered a new trial based on the state's failure to disclose impeachment evidence, noting that "[i]n a case that hinges on a victim's credibility, evidence that impeaches one of the victim's few corroborating witnesses is, without question, favorable to the accused." *Id.*

We are satisfied that the absence of any reported abuse in Schmidt's therapy notes for H.M. would be exculpatory within the meaning of Iowa Code section 622.10(4)(*a*), as would notes of H.M.'s descriptions of abuse materially inconsistent with her testimony. Such records would be useful in cross-examining H.M. and helpful to the jury in weighing her testimony. Confidential mental health information that is only marginally exculpatory can be protected by the district court under the balancing test in section 622.10(4)(*a*)(2)(c) ("If exculpatory information is contained in such records, the court shall balance the need to disclose such information against the privacy interest of the privilege holder.").

We encourage district court judges in close cases to examine the records in camera. This case is the third time we have reversed rulings that denied in camera inspections and remanded with instructions to conduct such reviews. *See State v. Edouard,* 854 N.W.2d 421, 442 (Iowa

---

[1]*See Brady v. Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963).

2014) (victim's records)*, overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 & n.3 (Iowa 2016); *State v. Neiderbach*, 837 N.W.2d 180, 198 (Iowa 2013) (codefendant's records). *But see Thompson*, 836 N.W.2d at 490–91 (holding the district court correctly denied motion for an in camera inspection of murder victim's mental health records because defendant failed to show nexus between her posttraumatic stress disorder treatment and any disputed issue at trial).

Our relief is conditional. If the district court finds no exculpatory evidence, then Leedom's convictions remain affirmed. *See Edouard*, 854 N.W.2d at 440. "If exculpatory evidence is found, the district court shall proceed as directed in section 622.10(4)(*a*)(2)(c) and (d) and determine whether [Leedom] is entitled to a new trial." *Id.* at 440–41 (quoting *Neiderbach*, 837 N.W.2d at 198).

We reiterate the "importance of maintaining confidentiality in mental health treatment." *Id.* at 441 (quoting *Thompson*, 836 N.W.2d at 483). The legislature chose to protect the "victim-patient's constitutional right to privacy in her mental health records" in part by having "a neutral judge review the victim's private records, rather than the advocate for the alleged abuser." *Id.* (quoting *Thompson*, 836 N.W.2d at 487). We trust our trial judges to fulfill that role while protecting the rights of the criminal defendants. *See id.*

Because we reverse the district court's ruling denying an in camera inspection on statutory grounds, we do not reach Leedom's constitutional claim for access to H.M.'s treatment records.

Leedom alternatively argues that H.M. waived the therapist–patient privilege in her deposition testimony when she testified that she told Schmidt about her grandfather's abuse. A valid waiver would allow Leedom access to the records without the showing required for the

in camera inspection. *See* Iowa Code § 622.10(4)(*a*)(1) (allowing defendant access in a criminal case when the "privilege holder voluntarily waives the confidentiality privilege"). The district court ruled that the privilege had not been waived. We agree. Leedom cites no decision by any court holding that a minor victim answering questions of a criminal defense attorney waives her patient–therapist privilege by testifying, when asked, that she told her therapist about the abuse. H.M., then age fifteen, lacked the legal capacity to waive the privilege. *See* Iowa Code § 228.3(1) (allowing an "individual *eighteen years of age or older* [to] consent to the disclosure of mental health information" (emphasis added)); *cf. Harder v. Anderson, Arnold, Dickey, Jensen, Gullickson & Sanger, L.L.P.,* 764 N.W.2d 534, 537–39 (Iowa 2009) (addressing parental authority to consent to release of minor's mental health records).

Moreover, H.M. was compelled to give deposition testimony, and her interrogation by her accused abuser's attorney is effectively a cross-examination. We have long recognized that a privilege is not waived by answering questions on cross-examination. *See Sprague v. Brodus*, 245 Iowa 90, 97, 60 N.W.2d 850, 855 (1953) ("[T]he rule is that waiver does not result from answering questions on cross-examination without objection as to the privileged communication."); *Johnson v. Kinney*, 232 Iowa 1016, 1023, 7 N.W.2d 188, 192 (1942) ("We have frequently said that testimony on cross examination is not voluntary in the sense that it constitutes a waiver of the statutory privilege.") (collecting cases); 7 Laurie Kratky Doré, *Iowa Practice Series:*™ *Evidence* § 5.501:6(D), Westlaw (current through Nov. 2019 update) ("Disclosure of privileged matter on cross-examination is generally not held to be a waiver."); *see also Brandon v. W. Bend Mut. Ins.,* 681 N.W.2d 633, 642 (Iowa 2004) (rejecting "the notion that a person waives a privilege by verifying the accuracy of answers to interrogatories

or by participating in framing the answers"). Other courts agree. *See Murray Energy Corp. v. Cassidy, Cogan, Chappell & Voegelin, L.C.*, No. 2:18-cv-440, 2019 WL 3406543, at *5 (S.D. Ohio July 29, 2019) (holding witnesses did not waive their attorney–client privilege by answering questions posed by opposing counsel in their depositions); *State ex rel. Shelter Mut. Ins. v. Wagner*, 575 S.W.3d 476, 481 (Mo. Ct. App. 2018) ("[A] waiver extorted under cross-examination is not voluntary. Likewise, disclosure in response to an adverse party's discovery inquiry is not voluntary." (alteration in original) (quoting *State ex rel. Behrendt v. Neill*, 337 S.W.3d 727, 730 (Mo. Ct. App. 2011))); *Barrier v. Beaman*, 390 P.3d 1048, 1049 (Or. 2017) (en banc) ("We now conclude that, by answering questions about his treatment at his discovery deposition, plaintiff did not 'offer'—and thereby voluntarily disclose—that testimony so as to waive his privilege.").

Leedom relies on waiver cases that are readily distinguishable. In *State v. Demaray*, we held the defendant waived the physician–patient privilege as to his blood alcohol test results when he signed a written consent to release his hospital records to the deputy investigating his arrest for operating while intoxicated. 704 N.W.2d 60, 66–67 (Iowa 2005). H.M. did not and could not execute a written release of her records, and the district court ruled her mother's release was ineffective.[2] In *Clay v. Woodbury County*, a civil case, the plaintiff sued for her emotional distress

---

[2]On appeal, Leedom does not rely on the waiver signed by H.M.'s mother, Teah, while the custody modification proceeding was pending. Schmidt's motion to quash argued Teah's authorization was contrary to the best interest of the child-victim-patient, H.M., in this intrafamily sexual abuse case in which Teah was aligned with her father, the criminal defendant. The district court rejected the argument that Teah could waive H.M.'s privilege under these circumstances. We agree. *See Harder*, 764 N.W.2d at 538 (holding a divorced, noncustodial parent could not obtain her children's mental health records by presenting a waiver to the mental health provider when the disclosure of the records was not in the best interest of the children).

after a jail strip search, disclosed copies of her psychiatric records, executed a valid written waiver, and "testified in detail" during her deposition regarding her psychiatric treatment sessions. 965 F. Supp. 2d 1055, 1060 (N.D. Iowa 2013). When she sought to limit the deposition of her psychiatrist, the court found she had waived privilege and that it was "far too late for [the plaintiff] to change her mind and reinstate the physician-patient privilege." *Id.* H.M. did not turn over Schmidt's therapy records, execute a waiver, or invoke the patient–litigant exception by suing Leedom. In *Miller v. Continental Insurance*, the plaintiffs filed affidavits disclosing their conversations with their lawyer about the statute of limitations; we held they thereby waived the attorney–client privilege as to that subject. 392 N.W.2d 500, 505 (Iowa 1986) (en banc). H.M. made no equivalent disclosure of her communications with her therapist. In *State v. Cole*, we considered implied waiver in a case in which the defendant was asserting a diminished-capacity defense and held the defense waived the privilege. 295 N.W.2d 29, 35 (Iowa 1980) (en banc). *Cole* predated Iowa Code section 622.10(4)(*a*)(1). H.M. did not assert any mental infirmities, so *Cole* is inapplicable. In *Squealer Feeds v. Pickering*, we held an insurer waived attorney–client privilege by designating its former attorney as an expert witness on an advice-of-counsel defense to bad-faith claims. 530 N.W.2d 678, 684–85 (Iowa 1995) (en banc), *abrogated on other grounds by Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 690 N.W.2d 38, 44 (Iowa 2004). Neither H.M. nor the State designated Schmidt as a testifying expert to put her advice at issue. Finally, in *State v. Heemstra*, we found the "medical privilege [was] neither abridged nor waived" in the criminal case. 721 N.W.2d 549, 563 (Iowa 2006). We ordered a limited in camera inspection in *Heemstra, see id.*, for reasons that have been superseded by the legislature's subsequent enactment of Iowa Code section

622.10(4)(*a*)(2). *See Thompson*, 836 N.W.2d at 490 (holding statutory protections supersede prior caselaw).

The district court correctly rejected Leedom's waiver argument. A contrary argument would undermine the statutory protections for the confidentiality of mental health treatment. *See id.* at 489–90; *see also Chung v. Legacy Corp.*, 548 N.W.2d 147, 150 (Iowa 1996) ("By choosing to adopt the privilege, the legislature made the policy judgment that complete and honest communications between a physician and patient would be enhanced by making these communications confidential.").

**B. Evidentiary Rulings.** Leedom argues the district court violated his constitutional right to present a defense by disallowing certain testimony. The State responds that the district court's preliminary rulings on admissibility were correct and that Leedom failed to preserve error through offers of proof. We agree with the State.

1. *Proposed testimony from the therapists and a defense expert.* Leedom sought to examine H.M.'s therapist, Jessica Schmidt, about communications during her sessions. Leedom alternatively argued that the State opened the door to rebuttal testimony by Schmidt to refute H.M.'s claim she disclosed Leedom's abuse in therapy. As noted above, Leedom wanted to show H.M. was lying because, as a mandatory reporter, Schmidt is required to disclose alleged abuse to DHS that would have triggered an investigation.

Leedom also sought to call Casie McGee, the family therapist, to testify about the injuries and demeanor that she observed when she met with Teah after the assaults. And Leedom asserts the trial court erred in granting the State's motion in limine excluding proposed defense expert testimony on whether children lie about sexual abuse allegations.

Asserting the patient–therapist privilege, McGee and Schmidt filed motions to quash Leedom's subpoenas for their trial testimony. The district court concluded that Leedom could not call them to testify unless the State opened the door.

> THE COURT: I'm not going to -- now your other argument that you want to bring these individuals in for an offer of proof, at this point, I'll let you make your offer of proof whenever we get to that point. So maybe it is a little premature, but I just don't see any way you get them to come on the stand and say what they do without the State opening that door.

The district court ordered the parties to stay away from the topic during the opening statements because it did not have the transcript of Schmidt's testimony during the hearing on the motion for in camera inspection. The court indicated it would entertain an offer of proof before the witnesses were called.

Leedom rested without calling these witnesses and never made an offer of proof. A ruling sustaining a motion in limine does not generally preserve error. *Quad City Bank & Trust v. Jim Kircher & Assocs., P.C.*, 804 N.W.2d 83, 89 (Iowa 2011). An exception exists when "the court's ruling on a motion in limine leaves no question that the challenged evidence will or will not be admitted at trial, [thus] counsel need not renew its objection to the evidence at trial to preserve error." *Id.* at 90. The court made no such unequivocal ruling as to Schmidt, McGee, or the defense expert. Leedom failed to preserve error.

2. *Exclusion of testimony from Teah Leedom.* Leedom sought to present evidence that Teah was attacked in her home on three occasions during the custody dispute over H.M. The court preliminarily ruled this evidence was irrelevant and prejudicial. The defense offered to make a record of proof later in the case, and the court agreed to allow them to do

so—"We can make a record at some point if you'd like," and "I'll allow you to make the offer at whatever point is appropriate." But Leedom never made that offer of proof. As such, he failed to preserve error. *Id.*

The evidence was inadmissible in any event. Leedom argues the evidence would support his defense theory that H.M. was willing to go to extreme lengths to live with her father given the timing and circumstances of the assaults. The State argues that this evidence is speculative, irrelevant, and unfairly prejudicial and therefore inadmissible. We agree with the State. *See* Iowa Rs. Evid. 5.401, .403.

Leedom cannot point to any evidence identifying who committed the assaults. There is no evidence that H.M. or her father had any connection to the assaults. The district court's preliminary ruling excluding this evidence was well within its discretion.

**C. Alleged Prosecutorial Misconduct.** Leedom argues that he "was denied a fair trial as a result of several instances of prosecutorial misconduct that prejudiced the proceedings." A defendant must show both misconduct and resulting prejudice to prevail on a claim of prosecutorial misconduct. *Neiderbach*, 837 N.W.2d at 209. To prove prosecutorial misconduct, the defendant must "show the prosecutor acted with reckless disregard . . . or intentionally made statements in violation of an obvious obligation, legal standard, or applicable rule that went beyond an exercise of poor judgment." *Coleman*, 907 N.W.2d at 139 (discussing the difference between prosecutorial error and prosecutorial misconduct).[3] Leedom asserts three acts of prosecutorial misconduct

---

[3]In *State v. Schlitter*, we adopted a recommendation of the American Bar Association to "distinguish between incidences of prosecutorial error and prosecutorial misconduct." 881 N.W.2d 380, 394 (Iowa 2016). Prosecutorial error can be the result of a "mistake or error during the heat of trial." *Id.* at 393. "[P]rosecutorial error is based on human error or the exercise of poor judgment." *Coleman*, 907 N.W.2d at 139. By contrast, prosecutorial misconduct generally involves intentional or reckless violations of

violated his right to a fair trial: eliciting expert testimony from Brazil that amounted to vouching, arguing jury nullification, and referring to statements made by Terri Leedom in her closing argument. We address each in turn.

1. *State's expert Brazil.* The Iowa Rules of Evidence allow expert testimony to assist "the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. "Expert testimony in child sexual abuse cases can be very beneficial to assist the jury in understanding some of the seemingly unusual behavior child victims tend to display." *State v. Dudley*, 856 N.W.2d 668, 675 (Iowa 2014). Experts may express general opinions but may not directly comment on the veracity of the child victim. *Id.* at 675–77 (summarizing the applicable legal principles for expert testimony in child sexual abuse cases). "[W]e are committed to the legal principle that an expert witness cannot give testimony that directly or indirectly comments on the child's credibility." *Id.* at 677. In *State v. Payton*, we allowed expert testimony to explain to the jury why child victims of sexual abuse may delay reporting the abuse, without testifying specifically about the victim in that case. 481 N.W.2d 325, 327 (Iowa 1992).

In our view, Brazil's testimony did not vouch for H.M.'s credibility. Brazil's testimony was general in nature describing why children delay disclosure, the grooming process, why children have an inability to recall specific dates, and the possibility that others can be in the room when abuse occurs. Brazil did not treat H.M. or meet with her on any occasion. Brazil never used H.M.'s name or referenced her. Brazil did not offer her

---

the law. *Id.* We reiterate our admonition that a "prosecutor who has committed error should not be described as committing misconduct." *Schlitter*, 881 N.W.2d at 394. Leedom has shouldered the burden of establishing prosecutorial *misconduct* rather than prosecutorial error.

opinion regarding H.M.'s truthfulness or specifically testify that H.M.'s behavior was consistent with the behavior of abuse victims generally. Brazil did not connect H.M.'s experience to the research that she relayed in her testimony. Brazil's generalized testimony is permissible under our precedent. Therefore, the prosecutor's elicitation of Brazil's testimony did not amount to prosecutorial misconduct.

2. *Arguing jury nullification.* Leedom seizes on the prosecutor's closing argument referring to the term "hesitate" as used in different instructions. Jury Instruction No. 7 stated in part,

> A reasonable doubt is a doubt based upon reason and common sense, and not the mere possibility of innocence. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it. However, proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

During her closing argument, the prosecutor said this about Jury Instruction No. 7,

> [T]he part that strikes me the most is we have this idea that if you hesitate to act, if this information would make you hesitate to act, but yet you're going to be instructed -- and I think it's No. 26, but you will see that also -- that when you deliberate, you're supposed to hesitate.

In doing so, the prosecutor referenced another jury instruction, No. 29, which stated in part,

> During your deliberations, do not hesitate to re-examine your view and change your opinion if convinced it is wrong. But do not change your opinion as to the weight or effect of the evidence just because it is the opinion of the other jurors, or for the mere purpose of returning a verdict.

Defense counsel objected unsuccessfully. The prosecutor continued,

> As I was saying, that instruction -- and if you look at the other instruction, and its number, so I make sure, is 29. And it tells

you when you go into the jury deliberation -- into your jury deliberation, you are supposed to hesitate.

Defense counsel again objected, stating that the prosecutor was urging jury nullification on the reasonable doubt instruction. The court overruled the objection but stated, "I would just remind the jury that the arguments of counsel are not evidence." The prosecutor then argued, "[H]esitation means that you stop and think, that's not what they're telling you in reasonable doubt. And we know that, because you're supposed to stop and think." The court left it open for defense counsel to object again, which he did not do.

Leedom contends the prosecutor's comments on the jury instruction deprived him of the right to a fair trial. We disagree. The comments fell short of seeking juror nullification, which is the jury's "right to acquit a defendant even if its verdict is contrary to the law and evidence." *State v. Hendrickson*, 444 N.W.2d 468, 472 (Iowa 1989).

The prosecutor confused the use of the word "hesitate" in two different instructions. This could be viewed as an attempt to water down the meaning of "hesitate" in the reasonable doubt instruction and was an improper form of argument. But the district court reminded the jury that the closing arguments are not evidence, and jurors were told to read the instructions together. The district court found no misconduct warranting reversal. We find no abuse of discretion and affirm.

3. *Referring to statements made by Terri Leedom.* Leedom further argues the prosecutor crossed the line into misconduct with her closing argument about Terri Leedom's testimony. Terri, Teah's mother and Leedom's ex-wife, testified about Leedom's home in Lake Ponderosa and the family dynamics. Terri testified that she was on speaking terms with Teah, but that changed after she talked with police about the alleged

abuse. There was no objection to Terri's testimony. In her closing argument, the prosecutor stated,

> So let's talk a minute about Terri Leedom. She, obviously, came in here, and she talked about some of the general stuff. But some of the really important stuff about Terri Leedom -- that's Teah's mom -- is that knowing that promise that you had, Terri came in here and said, "After I was called and gave evidence" -- or not evidence, I'm sorry, "After I was called and gave an interview to the police and told the police things, my daughter cut myself out of -- cut me out of her life. I don't have a relationship with my daughter or my granddaughter" -- I'm sorry -- "my daughter or my grandson." That's after she talks to the police.

> You can infer, especially from the lack of Teah coming in here and talking to you, that Teah didn't like what she had to tell the police. Teah talked to her mother about the charges, but [H.M.] never talked to her mother about the specifics.

> So, again, a lot of evidence that you have, you have to follow the evidence, and you have to see how it fits together for you. If you have a problem with this -- with this idea that, you know, Teah talks to her mom and, obviously, talks about something, because she did talk to her mom about the charges, and [H.M.] doesn't talk to her mom about specifics, [H.M.] must not have really -- or Terri must not really have had much to tell the police in regards to [H.M.]

Counsel can draw inferences from the evidence in closing arguments, but they cannot misstate or create the record. *State v. Carey*, 709 N.W.2d 547, 554 (Iowa 2006). The prosecutor was drawing on a reasonable inference from the evidence that one of the reasons that Terri's relationship with Teah deteriorated was that Teah did not like what Terri said to the police. The district court found no prosecutorial misconduct. We find no abuse of discretion and affirm.

**D. Order Quashing Subpoena for Prosecutor's Testimony.** Leedom subpoenaed the prosecutor, Assistant Attorney General Susan Krisko, to testify at the hearing on his motion for new trial. He alleged his right to compulsory process under the Federal and State Constitutions allowed him to compel the testimony of the opposing counsel to support

his claims of her prosecutorial misconduct during her closing argument and in her examination of Brazil. Leedom never explained why her testimony was required to adjudicate the claims of prosecutorial misconduct. Like the trial court, we examine the record of her conduct itself to determine if lines were crossed, regardless of what she was thinking at the time.

Leedom cites no Iowa authority compelling a prosecutor to testify. Leedom's right to compulsory process is subject to the rules of evidence, and what Krisko was thinking during trial is off-limits. *See* Iowa R. Civ. P. 1.503(3) (protecting an attorney's mental impressions); *Keefe v. Bernard*, 774 N.W.2d 663, 674 (Iowa 2009) (discussing scope of protection for attorney mental impressions); *see also Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986) (describing limited circumstances for compelling nonprivileged testimony from opposing counsel during litigation). In *State v. Brewer*, we affirmed a ruling that quashed a subpoena for the prosecutor's testimony as to why a witness was granted immunity. 247 N.W.2d 205, 211–12 (Iowa 1976). We recognized the defendant's right to compel testimony of the state's witnesses but pointedly observed, "A prosecutor is not a State witness." *Id.* at 212.

In *Chatman v. State*, the Indiana Supreme Court held the defendant had no right to compel the testimony of a prosecutor regarding his alleged misconduct for his questioning of a witness during the trial. 334 N.E.2d 673, 681–82 (Ind. 1975). The *Chatman* court noted, "It is elementary that counsel is not ordinarily subject to call to the witness chair" and viewed the defendant's "attempt to put the prosecutor upon the witness stand [as] an ill-concealed effort to turn the proceedings into a trial of the prosecutor and thus divert attention from the real issues of the case." *Id.* at 682. We reach the same conclusion here, and having resolved the misconduct

claims on the merits, we now affirm the district court's ruling quashing the subpoena of the prosecutor.

**E. Dismissal of Three Prospective Jurors.** Finally, we must determine whether a new trial is required because the district court, over Leedom's objection, excused three prospective jurors for work-related reasons. Leedom's trial began on June 26, 2018. The parties estimated that the trial could end as late as July 9. At the start of the jury selection, eight prospective jurors stated they had scheduling conflicts. The court excused five without objection for specified reasons (a funeral, medical appointment, scheduled surgery, and a long-planned vacation out-of-town).

Leedom challenges the district court's dismissal of three others. One described her conflict as "I'm to start a new job in one hour, and I take care of my disabled husband." Another stated he had a work trip on July 9. A third stated she was covering for two physical therapists at their locations who were out during that week. The State did not object to excusing those three, but defense counsel sought to develop a record and explore their reasons for avoiding jury duty. Without any further questioning, the district court dismissed those three prospective jurors.

Leedom contends that the trial court's dismissal of these three prospective jurors without allowing defense counsel to probe their reasons to avoid jury duty violated his Sixth Amendment right to a fair trial and a fair jury and his Fifth Amendment right to due process. Leedom urges our court to follow two Texas cases he cites for the proposition that the trial court cannot sua sponte excuse a juror unless he or she is "absolutely

disqualified," without mentioning that both those cases have been overruled.[4] We instead apply Iowa law.

The district court may dismiss a juror "upon a finding of hardship, inconvenience, or public necessity." Iowa Code § 607A.6. Reversal is warranted if there is "a *material* departure from the statutory requirements for drawing or returning the jury." *State v. Chidester*, 570 N.W.2d 78, 83–84 (Iowa 1997) (quoting former Iowa R. Crim. P. 17, now r. 2.18(3)). A material departure is one of "real importance or great consequence." *Id.* at 84 (quoting *Webster's Third New International Dictionary* 1392 (unabr. ed. 1993)). "We think a departure from statutory requirements is of real importance or of great consequence only when the defendant's rights have been prejudiced." *Id.*

Juror service is an important civic duty that should be the norm for those summoned. "[W]e are mindful that persons should not be excused from their public responsibility of jury service for mere inconvenience, distaste for service, or even the threat of some loss of income." *Hobson*, 284 N.W.2d at 241. We strongly encourage trial judges to question prospective jurors on their claimed hardships before excusing them. In Leedom's trial, the judge should have probed the three prospective jurors'

---

[4]Leedom cites to *Payton v. State*, 572 S.W.2d 677 (Tex. Crim. App. 1978) (en banc), without noting it was overruled by *Jones v. State*, 982 S.W.2d 386, 394 (Tex. Crim. App. 1998) (en banc); and also cites to *Nichols v. State*, 754 S.W.2d 185 (Tex. Crim. App. 1988) (en banc), without noting it was overruled by *Harris v. State*, 784 S.W.2d 5, 19 (Tex. Crim. App. 1989) (en banc). Insanity, indictment, and criminal convictions are grounds for "absolute disqualification" under the Texas Code of Criminal Procedure article 35.16(a)(2)–(4) and article 35.19. The *Harris* court recognized a different provision, article 35.03, confers discretion on judges to excuse jurors for a variety of reasons including work, travel, and weddings. 784 S.W.2d at 18–19. The court later affirmed the release of a prospective juror because she was apprehensive over being away from work. *Butler v. State*, 830 S.W.2d 125, 127–28, 132 (Tex. Crim. App. 1992) (en banc) (per curiam).

reasons or allowed defense counsel to question them before excusing them.[5]

But we decline to find that this shortcoming requires a new trial. The district court determined that each prospective juror had a work-related hardship, a valid basis for dismissing a juror. *Id.* Leedom has not shown the court's dismissal of these jurors constituted a material departure from statutory requirements or that he was prejudiced.

**IV. Disposition.**

For the foregoing reasons, we reverse the district court's ruling denying Leedom's motion for an in camera review of the records of H.M.'s therapist, Jessica Schmidt. We remand the case for the district court to conduct that review pursuant to section 622.10(4)(*a*)(2) to determine whether those records contain exculpatory information. If the district court finds no exculpatory evidence in those records, Leedom's conviction remains affirmed. If exculpatory evidence is found, the district court shall proceed as directed in section 622.10(4)(*a*)(2)(c) and (d) and determine whether Leedom is entitled to a new trial. We affirm on all other issues.

**DISTRICT COURT JUDGMENT CONDITIONALLY AFFIRMED; CASE REMANDED WITH INSTRUCTIONS.**

---

[5]The Committee on Jury Selection has recommended a "liberal deferral policy . . . to reduce the number of outright excusals. Potential jurors should be able to reschedule their service once without any questions asked." Comm. on Jury Selection, *Recommendations of the Committee on Jury Selection* 7 (March 12, 2018), https://www.iowacourts.gov/for-the-public/reports/.